ANDREW H. McNEAL v. CHARLES A. BRAUN.

The plaintiff, a dealer in coal in Philadelphia, made a contract with defendant for the sale of a quantity of coal of approved size and quality, to be delivered by the plaintiff at Burlington, at $4.10 a ton delivered. The coal was selected by the plaintiff from his stock of coal, and shipped in a barge selected by him. The barge reached the port of Burlington in safety, and was laid alongside of the defendant's wharf for the purpose of unloading in the evening just before usual quitting time. During the succeeding night the barge sank and the coal was lost. In an action by the plaintiff to recover the contract price of the coal, *Held*—

1. That delivery of the coal at Burlington, by the vendor, was a material term in his contract, and that the delivery of the coal on board of the barge was delivery to the master as the vendor's bailee or agent to perform for him the act of delivery in execution of his contract, and that until delivery was consummated the coal was at the vendor's risk.

2. That under a shipment of goods by a carrier, the consignee is entitled to inspect and examine the goods to ascertain whether they correspond with the invoice, and to a reasonable time to receive and remove the goods. For that purpose a reasonable time within usual business hours must be allowed, and during that period the liability of the carrier as carrier remains undischarged.

3. Under a contract of sale whereby the vendor contracted to deliver goods to the purchaser at a particular place, the carrier selected by the vendor is his agent to perform the contract to deliver, and the vessel in which the goods are carried is *pro hac vice* the vendor's vessel, and he must bear the responsibility for the negligence of the carrier and for the condition of the vessel.

4. Upon a contract of affreightment for delivery at a port generally, the consignee, if he owns the entire cargo, has the option to designate the place for discharging the cargo, and it is the master's duty to obey the consignee's directions if the option be exercised in a reasonable manner.

5. The consignee, in exercising his option to select the wharf, is bound to provide a wharf which is safe as well for the vessel as for the discharging of the cargo. If a loss of the cargo in such a case is occasioned by the condition of the wharf selected, without any negligence of the master in the management and care of the vessel, and was not due to the vessel's unseaworthiness or defective condition, the consignee must bear the loss.

6. In executing a commission to take the depositions of witnesses residing out of this state, under the act concerning evidence (*Rev., p. 383*), the certificate of the officer before whom the oath of commissioner was taken, that he was lawfully authorized to administer an oath in the state where the commissioner resides or may be at the time, is sufficient evidence that the officer has such authority.

On error to the Supreme Court.

For the plaintiff in error, *Samuel H. Grey.*

*Contra, Charles E. Hendrickson.*

The opinion of the court was delivered by

DEPUE, J. Braun, the plaintiff below, in 1883 was a wholesale dealer in coal at Philadelphia. McNeal, who is

now plaintiff in error, was engaged in the foundry business at Burlington, in this state.

On the 14th of June, 1883, McNeal ordered from the plaintiff ninety-eight tons of lump and steamboat coal, to be delivered at Burlington, at $4.10 a ton delivered. The coal was shipped in a barge called "The Wayward," on the 21st of June. The barge arrived at Burlington on the 23d, but it was not until the 26th that she was laid alongside of the wharf. On the afternoon of that day the defendant's foreman notified the captain of the barge to place it alongside of the defendant's wharf. In order that the boat might be so placed that the steam-hoist could be used for unloading, the boat was separated into its two parts. The forward part was made fast to the wharf, being separated from the wharf by a float about three feet wide, furnished by the defendant, for the purpose of steadying the boat in a position that was necessary for the working of the iron buckets on the steam elevator. The after part of the boat was moored on the river side of the other part.

When the forward compartment of the boat was placed in position, the buckets of the hoisting works were lowered upon the boat, and preparations were made by the defendant's servants for unloading the coal. They completed their preparations about ten minutes before six o'clock, and stopped work at six, the usual time for quitting work. During the night this compartment of the boat sank with the coal that was in it.

The compartment that was moored in the river remained in safety. After the sinking of the forward compartment, the coal that was in the other compartment was unloaded and taken by the defendant. The suit was for the whole quantity of coal sold, but the controversy at the trial was with respect to the coal that was sunk and entirely lost. Under the charge of the court, the jury found for the plaintiff the full contract price for the entire shipment.

The order for the coal was given by the defendant to Arkless, the agent of the plaintiff, at the plaintiff's place of busi-

ness in Philadelphia. The order was for a cargo of coal of an approved size and quality. The coal was not, at that time, separated from the plaintiff's stock on hand. The price to be paid was $4.10 per ton delivered at Burlington. The carrier was selected by the plaintiff, and he took from him a bill of lading, signed by the master, in these words: "Shipped by Charles Braun, in good order, on board the boat called Wayward, now lying at Philadelphia, and bound for Burlington, N. J., ninety-eight tons of Thomas Lehigh coal, which I promise to deliver at the aforesaid port of Burlington, in like good order, the dangers of the seas only excepted, unto A. H. McNeal or —— assigns, he or they paying freight for the same at the rate of twenty one-hundredths dollars per ton.

> 25 tons lump.
> 73 tons steamboat.
> ——
> 98                    Captain to tend guy."

The contract price of $4.10 a ton was the price of the coal delivered at Burlington. If the defendant paid freight pursuant to the direction in the bill of lading, the freight paid was to be deducted from the contract price.

Responsibility for loss in transportation, in carriage by sea, has occasioned considerable discussion in the English courts. The rules on this subject are stated by Lord Cottenham in *Dunlop* v. *Lambert*, 6 *Cl. & F.* 600, 619, 620, 621, and by the Court of Queen's Bench and the Exchequer Chamber in *The Calcutta Company* v. *DeMattos*, 32 *Law Jour. Q. B.* 332; 33 *Id.* 214; and particularly by Mr. Justice Blackburn, whose opinion in that case is quoted at considerable length in 1 *Benj. Sales (Corbin's ed.)*, § 503, and more fully in *Blackb. Sales (Blackstone's ed.)* \*234.

It is sometimes stated, as a general rule, that delivery to the carrier is delivery to the consignee, and that the goods are to be carried to their destination at his risk. But an examination of the decisions to that effect will show that this doctrine prevails only where the contract of sale, as between the consignor and consignee, was concluded at the place of ship-

ment, and the undertaking to ship was collateral to the contract of sale, as in *Tregelles* v. *Sewell*, 7 *Hurlst. & N.* 573.   It will also be found that the rule, uniformly adopted in the line of decisions, is that the risk of loss in transportation depends upon the nature of the transaction, the terms of the contract and the intention of the parties.   In *Dunlop v. Lambert*, Lord Cottenham said :.  " When the party undertaking to consign undertakes to deliver at a particular place, the property till it reaches that place, and is delivered according to the terms of the contract, is at the risk of the consignor."   In *Calcutta Company v. DeMattos,* Mr. Justice Blackburn said :  " There is no rule of law to prevent the parties from making whatever bargain they please.   If they use words in the contract showing that they intend that the goods shall be shipped by the person who is to supply them, on terms that when shipped they shall be the consignee's property and at his risk, so that the vendor shall be paid for them whether they are delivered at the port of destination or not, this intention is effectual. *   *   *   If the parties intend that the vendor shall not only deliver them to the carrier, but also undertake that they shall actually be delivered at their destination, and express such intention, this is also effectual.   In such a case, if the goods perish in the hands of the carrier, the vendor is not only not entitled to the price, but he is liable for whatever damage may have been sustained by the purchaser in consequence of the breach of the vendor's contract to deliver at the place of destination."

The DeMattos case, above cited, was decided in the Queen's Bench by an equally divided court, and in the Exchequer Chamber there was a diversity of opinion among the judges. But on the question of law pertinent to this case there was entire unanimity of opinion among the judges in both courts. The contract of sale had been negotiated by correspondence, and the material facts were briefly these :  DeMattos contracted to deliver the company one thousand tons of coals, delivered at Rangoon, alongside, &c., at forty-five shillings a ton—payment, one-half by bill at three months on handing over bill

of lading and policy of insurance on the cargo to cover the payment, and the balance in cash on delivery at Rangoon. DeMattos chartered a ship, and shipped on board eleven hundred and sixty-six tons of coal and delivered to the company the bill of lading and the policy of insurance, and the company paid the half of the invoice price. On the voyage the ship became disabled, and, in fact, the coals were not delivered under the contract. Cross suits were brought—the one by DeMattos to recover the unpaid contract price, the other by the company to recover back the money paid on the contract. The Queen's Bench (Cockburn, C. J., and Wightman, J.) decided that DeMattos could not recover the residue of the contract price, and that the company was entitled to recover back the money paid as damages arising from the breach of contract. Blackburn and Mellor, JJ., concurred in the view that DeMattos could not recover, but held that the company was not entitled to recover back the half contract price it paid, for the reason that, by their construction of the contract, the portion of money paid to DeMattos was to be absolutely his on handing over the policy and the bill of lading. In delivering his opinion, Cockburn, C. J., said: " In every contract of sale, there is, on the part of the vendor, an obligation not only to transfer the property in the thing sold, but also to deliver possession to the buyer. When and how that delivery of possession shall take place, whether in the interval the thing sold shall be at the risk of the buyer or of the seller, so that if it be lost without default on the part of the latter, he shall nevertheless be entitled to demand the price or to retain it if already paid, must depend on the agreement of the parties as expressed or to be gathered from the contract. If, by the terms of the contract, the seller engages to deliver the thing sold at a given place, and there be nothing to show that the thing sold was in the meantime to be at the risk of the buyer, the contract is not fulfilled by the seller unless he delivers it accordingly."

In the Exchequer Chamber the majority of the court concurred in the views of Blackburn and Mellor, JJ., in the

company's case, by a divided court, but all the judges concurred in the judgment of the Queen's Bench, that DeMattos' action could not be maintained.    It will be observed, that of the ten judges who sat in both courts, Cockburn, C. J., and Wightman, Blackburn and Mellor, JJ., in the Queen's Bench, and Erle, C. J., Willes, J., Channell, B., and Williams, J., held that the property in the coals passed to the company by force of those terms of the contract in relation to insurance of the cargo and the transfer of the policy and the delivery of the bill of lading, but that the vendor was nevertheless debarred from recovering the unpaid contract price as a consequence of his failure to deliver the coals according to contract.

It was undisputed in the case now before the court, and, in fact, was conceded by the plaintiff's counsel, that delivery of the coal by the plaintiff, at Burlington, at his own expense, was a material term in the contract of sale.    Under a contract of this sort, delivery of the coal on board the barge was delivery to the master as the plaintiff's bailee or agent to perform for him the act of delivery in execution of his contract. 1 *Benj. Sales (Corbin's ed.)*, § 566.    Meanwhile, and until delivery was consummated in such a manner as to be effectual as between vendor and purchaser, the coal was at the plaintiff's risk.

On the main issue, which the learned judge declared to be the question whose loss was the coal which sank, his instruction was that this issue would depend upon whether the sale had been completed before the loss occurred ; that where parties have bargained, the one that he will sell and the other that he will buy, the duty rests upon the seller to deliver the article in pursuance of the agreement he has made, and that to complete the sale there must be an acceptance by the purchaser of the article which he purchased, in accordance with that agreement; that when that has been done " the sale is completed, and any loss after that time falls upon the man who bought.    I mean any loss which is the result of no wrongful or intentional negligence of the parties."

The court also instructed the jury that if there was an acceptance by the defendant, then the position of the captain became changed, and his duty as the agent of the plaintiff was at an end. And this question was left to the jury upon the acts and conduct of the defendant's servants before they stopped work that night, with the instruction that if the jury should determine from the testimony "that the defendant or his employes so acted that they recognized that that coal was there at their disposal, under their dominion, within their power, and that they so acted as to show that they were dealing with it as if it were McNeal's, from those acts you may determine that there was an acceptance of the coal as being the coal which had been bought under that bargain."

The transaction between the parties was an order for a certain quantity of coal, part lump coal and part steamboat coal, of an approved quality. It was in effect a contract of sale by sample. On such a sale of goods it is a condition implied by law that the buyer shall have a fair opportunity, by examining the goods, to satisfy himself that they are in accordance with the contract. 2 *Benj. Sales* (*Corbin's ed.*), §§ 910, 1025, 1042; *Isherwood* v. *Whitmore*, 11 *Mees. & W.* 347; *Startup* v. *McDonald*, 6 *Man. & G.* 593; *Croninger* v. *Crocker*, 62 *N. Y.* 152. And under a shipment of goods by a carrier the consignee is entitled to inspect and examine the goods to ascertain whether they correspond with the invoice, and to a reasonable time within which to receive and remove the goods. For that purpose a reasonable time within usual business hours must be allowed, and during that period the liability of the carrier as carrier remains undischarged. *Bradstreet* v. *Heron, Abb. Adm.* 209, 214; *Salmon Falls Manufacturing Co.* v. *The Bark Tangier*, 1 *Cliff.* 396; *Dibble* v. *Morgan*, 1 *Wood* 406; *The Tybee, Id.* 358, 363; *The Barque Idd* v. *Kemball*, 8 *Ben. Adm. Pr.* 297; 5 *Myer Fed. Dec.*, "*Carriers*," §§ 802, 803, 846, 852, 1009; *The Eddy*, 5 *Wall.* 481, 493; *Price* v. *Powell*, 3 *Comst.* 322; *Dunham* v. *B. & A. R. R. Co.*, 46 *Hun* 245; *Miller* v. *Steam Navigation Co.*, 6 *Seld.* 431; *Hedges* v. *H. R. R. Co.*, 6 *Robt.* 119; reversed in Court

of Appeals, but not on this point, 49 *N. Y.* 223; *Moses* v. *B. & M. R. R. Co.,* 32 *N. H.* 523; *Graves* v. *The H. & N. Y. Steamboat Co.,* 38 *Conn.* 143, 152; *Richardson* v. *Goddard,* 23 *How.* 28, 39; *Bourne* v. *Gatliffe,* 3 *Man. & G.* 643, 687; *S. C.,* 11 *Cl. & F.* 45, 70; 3 *Lew. Annot. R. R. & Corp. Rep.* 54; *note to Columbus and Western R. R. Co.* v. *Luddem.*

The acts done by the defendant's servants before they quit work were of a two-fold character. *First.* In directing the barge to be laid alongside of the wharf for unloading. The captain made the boat fast to the wharf and remained in charge during the night. The designation by the defendant of his wharf as the place for unloading, was an act in performance of the defendant's duty as consignee to provide a place for the discharge of the cargo. *Second.* In the preparations for unloading. The barge was laid alongside the float about ten minutes before six. The buckets were lowered down upon the barge, and possibly a small quantity of coal was unloaded. The hands quit work at six, and replaced the buckets on the wharf. In these acts there was no evidence of an acceptance of the entire cargo, nor of a discharge of the carrier from his responsibility. Under the rules of law I have stated, the defendant was entitled to a reasonable opportunity to unload the entire cargo for examination, to ascertain whether the coal corresponded with his order and had arrived in good condition. By law he was secured these rights without discharging the liability of the carrier. Even if the goods had been accepted so as to pass title as between vendor and purchaser, the defendant, under the plaintiff's undertaking to deliver them at Burlington, still had a right to a reasonable time to unload them under the plaintiff's contract to transport and deliver the goods.

When the defendant's employes quit work that evening the float was removed, leaving the barge riding free. She sank in a falling tide about three in the morning, listed over away from the wharf. There was no unusual condition of the tide or weather. One of the witnesses testified that after

the men quit work he saw that the lines with which she was tied were taut, and that he told the captain that his line was taut, and that if he did not give her more rope the lines would have to part, or else tear the cleats off the the boat, and that the captain said he knew his own business. The same witness testified that in the night he heard the noise of the creaking of the lines and found the barge sinking; that the captain was there making an effort to save her, and tried to slack the lines, but they were so taut that he could not slack them, and that the boat sank with the lines fastened to the wharf and taut. Besides evidence in relation to the acts and conduct of the captain, there was evidence tending to show that the boat was rotten and unseaworthy.

The defendant asked the court to charge, first, that the defendant was entitled to reasonable time within ordinary business hours for discharging the cargo, and plaintiff was bound to furnish a boat that would float long enough to be discharged. This instruction was refused, and the court charged "that a good delivery implied that the goods should be delivered in such a vessel as would stand the ordinary length of time and the ordinary stress of weather; that if even after acceptance it became evident that the loss was the result of the utterly unsuitable condition of the craft chosen by the plaintiff, then he still might be liable under one set of circumstances, and that is, if he had shown negligence in selecting that boat—that is, if in selecting the boat he had not acted as a prudent business man ought to have acted."

To the refusal to charge as requested, and the charge as given, the defendant excepted.

Another request of the defendant was that the court should charge that the captain was the agent of the plaintiff, and that the plaintiff was chargeable with his want of care and want of skill. This request was denied, and the court charged that "the plaintiff is not responsible for the way the captain managed his boat. The captain was not his servant. The captain was his instrument to complete the sale, but he was not under his personal control as to how he should manage

his boat. Therefore, the mere negligent conduct of the captain cannot be imputed to the plaintiff. He could not have controlled his movements. The plaintiff, if he had been there, could not have dictated to the captain how he should manage his boat."

To the refusal to charge as requested, and to " that portion of the charge touching the law of negligence, and the relation which the plaintiff bore to the captain of the boat, and that the negligence of the captain was not imputable to the plaintiff," the defendant excepted.

These instructions might have been correct if the plaintiff had been the agent of the defendant in the shipment of the coal. But the plaintiff, instead of being an agent to procure transportation, had himself contracted to deliver the coal, and these instructions ignore the fact that under a contract of that sort the undertaking to deliver is absolute and unqualified, and delivery of the goods is a condition precedent to the right of the vendor to sue for the contract price. If the goods be lost or destroyed before delivery is consummated, the vendor must bear the loss. Under such a contract the carrier selected by the vendor is his agent to perform the contract to deliver, and the vessel in which the goods are carried is *pro hac vice* the vendor's vessel. For the negligence of the one and the condition of the other, and, indeed, for failure to make delivery of the coal according to contract for any cause not due to the fault of the purchaser, the responsibility is upon the vendor.

There is some conflict in the testimony as to whether the contract was for delivery at the port of Burlington generally or alongside of the defendant's wharf. Whether the contract was in the one form or the other is immaterial in this suit. The discharge of the cargo is the joint act of the freighter and the consignee. Each must participate in unloading the cargo, and each has duties to perform in the premises. The consignee must provide a suitable place for discharging the cargo, and if the contract of affreightment is for delivery at a port generally the consignee, if he owns the entire cargo, has the option

to designate the place for discharging the cargo, and it is the master's duty to obey the consignee's directions in that respect if the option be exercised in a reasonable manner. *The Felix,. L. R.,* 2 *Adm.* 273, 280 ; *Abb. Sh.* 376 ; *Carv. Carr. by Sea,* §§ 479, 460 ; *The Boston,* 1 *Low. Dec.* 464.

The barge reached Burlington with its cargo in safety. The defendant's agent selected the defendant's own wharf for discharging the cargo, and there was some evidence that the wharf was out of repair and in a dangerous condition. The consignee, in exercising his right to select the wharf, was bound to provide a wharf which was safe as well for the vessel as for the discharge of the cargo. If the sinking of the barge was caused by the condition of the wharf, without the negli- gence of the captain in the management and care of the boat, and was not due to its unseaworthy or defective condition, the defendant must bear the loss.

The barge reached the port of Burlington on the 23d, and' was not laid alongside. of the wharf until the evening of the 26th, on account of the crowded condition of the wharf. The detention of a vessel beyond the lay days named in the con- tract of affreightment, or for an unreasonable time if no lay days are named, because of the crowded condition of the wharf selected by the consignee, or for any fault of the con- signee, will entitle the master to discharge the cargo elsewhere and warehouse it, or to demurrage or reasonable damages for the detention of the vessel, but will not release him from his. duty to deliver the goods. *Macl. Ship.* (3d ed.) 438, 449 ; *Carv. Carr. by Sea,* § 627. No injury happened to the barge or its. cargo while it lay at port. The disaster occurred after it was placed alongside of the wharf to be unloaded. The reason- able time allowed the consignee for unloading the cargo is to be computed from the time the barge was laid alongside of the wharf ready for the discharge of the cargo.

The exceptions above noted were well taken, and upon them the judgment should be reversed.

Exception was taken to the admission of the deposition of Arkless, taken under a commission, on the ground that it did

not appear that the commissioner was sworn before a person. lawfully authorized to administer an oath in the state where the commissioner resided, in compliance with the statute. *Rev.*, *p.* 383, § 33. The commission was sent to the State of Ohio, and the commissioner who resided in that state was sworn before a notary public. In the *jurat* affixed to the oath the notary certifies under his official seal that he "was lawfully authorized to administer an oath in the said State of Ohio." Ever since the dictum of Chief Justice Hornblower in *Ludlam* v. *Broderick* (decided in 1836), 3 *Green* 273, and of Mr. Justice Ford in *Den.* v. *Thompson*, 1 *Harr.* 72, it has been considered that the certificate of the officer before whom the oath is taken in this form is sufficient. See *Den.* v. *Applegate*, 3 *Zab.* 115, and *Lawrence* v. *Finch*, 2 *C. E. Gr.* 234. This rule of practice is of too long standing to be now disturbed. The deposition of the witness was properly admitted in evidence.

*For affirmance*—None.

*For reversal*—The Chancellor, Chief Justice, Depue, Dixon, Knapp, Magie, Reed, Van Syckel, Brown, Clement, Smith. 11.