## EASTON v. GEORGE WOSTENHOLM & SON, Limited.

(Circuit Court of Appeals, Ninth Circuit. May 1, 1905.)

No. 1,153.

1. PARTNERSHIP—DISSOLUTION—RETIRING PARTNER'S LIABILITY—WHAT LAW GOVERNS.

Where a partnership was organized in California, the liability of a retiring partner to a creditor of the firm was governed by the law of California, though it also carried on business in Costa Rica.

2. SAME—GOODS PURCHASED ABROAD.

Where a firm doing business in California and Costa Rica purchased goods in England through complainant, as a purchasing agent, under an agreement that complainant in England should advance the money for the purchase, and to prepay freight, insurance, and other charges, for a commission of 5 per cent., complainant's contract was to be performed in England, and was therefore governed by English law; and this though some of the goods were ordered through complainant's agent in Costa Rica, authorized "to take orders and make needful business arrangements."

3. SAME—SHIPMENT OF GOODS—TITLE—DELIVERY TO CARRIER—RETIRING PARTNER.

Where a firm employed complainant to purchase goods for it in England—complainant agreeing to advance money for the purchase, and to prepay freight, insurance, and other charges, for a commission of 5 per cent.—title to goods so purchased passed to defendant firm on delivery of the goods to a common carrier for transportation to such firm, as against a retiring partner, regardless of the time when the bill of lading therefor was mailed.

[Ed. Note.—For cases in point, see vol. 43, Cent. Dig. Sales, § 535.]

4. SAME—HARMLESS ERROR.

Where, in an action by an English purchasing agent against the retiring partner of a firm to recover advances made to purchase goods ordered by the firm, the court properly charged that, as against such retiring partner, the title to the goods passed to the firm on delivery to a carrier prior to the agent's acquiring notice of the partner's retirement, other instructions in conflict therewith were favorable to defendant, of which he could not complain on appeal.

5. SAME—ESTOPPEL.

Where a firm for which complainant had been acting as purchasing agent in a foreign country dissolved, and defendant, the retiring partner, relied on his continuing partner to give notice of his retirement, but he gave no notice thereof to complainant, defendant was estopped to deny his liability for a debt subsequently contracted by the continuing partner to complainant for goods purchased in the ordinary course of business.

6. SAME—STOPPAGE IN TRANSITU.

Where a purchasing agent of a firm from whom goods were ordered in the ordinary course of business by the continuing partner had no knowledge of the dissolution of the firm and of defendant's retirement until

after the goods had been delivered to a carrier for transportation, as ordered, such purchasing agent was not bound to stop the goods in transitu in order to protect defendant from liability and loss.

In Error to the Circuit Court of the United States for the Northern District of California.

This is an action brought by the defendant in error, as plaintiff, for an alleged indebtedness of £3,747 3s. 7d., English money, or its equivalent, $18,173.82 in gold coin, with interest thereon at the rate of 5 per cent. per annum from December 21, 1898, against the firm of Schwartz, Lowe & Co., a copartnership organized in 1894 at San Francisco, Cal., composed of the plaintiff in error, L. Leon Lowe, William Schwartz, Samuel Schwartz, and David Speyer. In 1895 Speyer's interest in the copartnership was purchased by the other members of the firm, and the business was thereafter continued in the firm name, and places of business maintained at San Francisco, Cal., and at San Jose de Costa Rica, Central America. It appears "that on or about the 10th day of August, 1899, at said San Jose de Costa Rica, plaintiff [defendant in error] executed with other creditors an agreement in writing for the compensation and liquidation of the debts of said Luis Leon Lowe, as a bankrupt, who was then and after the said 21st day of December, 1898, engaged in business alone at the place last named, under said firm name and style of Schwartz, Lowe & Co., which said agreement also provided for the distribution among his creditors of his estate, if any, in a certain manner, plaintiff thereby releasing and discharging said Lowe from all claims and demands then held or asserted by it against him; but said agreement was so executed by plaintiff with the following express provision, to wit: 'Without waiving or in any manner affecting our [plaintiff's] claims against the other [said] members of the recent firm of Schwartz, Lowe & Company, which it is not intended this agreement shall operate to discharge.'" The action was tried before a jury, which rendered a verdict against Ansel M. Easton for $20,401.36, and against each of the Schwartzes for $22,003.49, and judgment was entered accordingly, from which Easton alone brings error, to have the case as against him reviewed by this court.

Without entering into all the details of the evidence, it may be said that there are two orders for goods specially involved in this case—one dated March 30, 1898, and the other October 1, 1898. It appears from the testimony in the record that the business between the parties commenced in January, 1897, under an arrangement made by William Schwartz, representing the firm of Schwartz, Lowe & Co.; that the defendant in error was to purchase goods for the firm of Schwartz, Lowe & Co. at a profit, and was to pay all charges for freight and insurance on goods to Port Limon and Punta Arenas, Costa Rica, and through freight to San Jose de Costa Rica, as requested by said firm, and a commission to be charged on payments made for freight and insurance; that in October, 1897, the agreement was changed, and an arrangement made that on certain goods, instead of charging a profit, the defendant in error should charge 5 per cent. commission on all proprietary articles it bought for the firm. In March, 1898, in San Jose de Costa Rica, the defendant in error, by its representative, Thomas Wing, met Luis Leon Lowe, and took orders and made arrangements to ship further goods to the firm of Schwartz, Lowe & Co. at a profit, and on commission; all freight and insurance to be paid in England, and charged to Schwartz, Lowe & Co., plus a commission. On June 20, 1898, the firm of Schwartz, Lowe & Co. was dissolved by an agreement of the members of the firm, but no public notice thereof was given until December 8, 1898, when it was published in a newspaper in San Francisco, Cal. In the meantime defendant in error was expending money in the purchase of goods for Schwartz, Lowe & Co., with instructions from the firm, as usual from Lowe, upon the firm letter paper, over the firm name, in accordance with the usual course of dealing between the parties. The second order was thus given on October 1, 1898. On November 18th the defendant in error received an unusually large order, which would amount to an outlay of about $75,000; and on the 28th of November, 1898, defendant in error cabled to the Crocker-Woolworth National Bank of San Francisco (which William Schwartz had given as a reference) to know

whether Schwartz, Lowe & Co. were good for an advance of £15,000. To this the bank replied on December 2, 1898, "Are without particulars; do, not know," and later, on the same day, at the request of Mr. Easton (plaintiff in error), telegraphed that Easton was no longer a member of the firm. On the same day Mr. Easton, through his counsel, George C. Sargent, sent a notice of the dissolution of the firm, which was received by the defendant in error December 17, 1898.

The testimony shows that in filling the orders given by Schwartz, Lowe & Co. the defendant in error did so on the distinct understanding that Mr. Easton, a wealthy man, was a member of the firm, and liable for its engagements; that it would neither have given the credit nor entered into business transactions with the firm if this had not been the case. It is stipulated between the parties that all shipments of merchandise made by the defendant in error which were shipped prior to November 1, 1898, were delivered to Lowe before December 2, 1898. That other shipments were made by the defendant in error as follows (the first date is that upon which the goods left the defendant's works): November 1, 1898, £519, arrived at customhouse at Port Limon, Costa Rica, November 25, 1898; delivered out of customhouse to Lowe December 15, 1898. November 9, 1898, £243, arrived at customhouse at Port Limon December 7, 1898; delivered to Lowe out of customhouse February 9, 1899. November 18, 1898, £310, arrived at customhouse, Port Limon, December 17, 1898; delivered out of customhouse to Lowe May 29, 1899. December 2, 1898, £263, arrived at customhouse, Port Limon, December 31, 1898; delivered Lowe out of customhouse part January 13, 1899; part May 29, 1899. December 7, 1898, £147, arrived at customhouse, Port Limon, January 4, 1899; delivered to Lowe out of customhouse part February 14, 1899; part May 27, 1899; part June 15, 1899; balance July 13, 1899. December 16, 1898, £270, arrived at customhouse, Port Limon, January 16, 1899; delivered out of customhouse to Lowe or his assignee subsequent to July 13, 1899.

In the deposition of J. C. Wing, he testified as follows: "Q. Has plaintiff any orders for goods, signed, 'Schwartz, Lowe & Co.' which were on file on December 21, 1898, and which plaintiff did not fill? A. Yes; immediately I learned that the partnership was dissolved, all orders in hand were suspended, except such as were in such a position that dispatch could not well be avoided, and plaintiff paid a considerable sum to cancel contracts entered into on defendant's account. I understood that all goods dispatched after that date could not be charged to the firm as originally constituted, and no claim for them is made in the present action." In reply to a question asked witness as to what authority plaintiff had to incur and charge defendants with freight, insurance, and other matters, he said: "It is almost universally the case that shippers pay freight, insurance, and other expenses. October 1, 1898, Schwartz, Lowe & Co., Costa Rica, say: 'Freight paid through to San Jose.' These terms, I understand, were made between William Schwartz and Thomas Wing, when the account was opened." In replying to questions as to what information he received as to the dissolution of the firm of Schwartz, Lowe & Co., and as to why he sent the telegram of inquiry, the witness answered: "As the defendants' Costa Rica branch proposed to make shipments of coffee and other produce, which would involve considerable sums, plaintiff considered it prudent to obtain further information as to the standing of the San Francisco branch. When William Schwartz was in Sheffield, I understand he informed Thomas Wing that, if plaintiff wished at any time to apply for reference, he should do so to the Crocker-Woolworth National Bank, San Francisco." Then after reciting the telegrams hereinbefore stated, and the replies, said: "This was the first intimation of any change in the firm. Mr. Sargent's letter of December 1st was the official information. I know of no oral or written intimation from any person whatsoever previous to these dates." The first telegram to the bank was the first intimation that Easton had that the firm name had been used since the dissolution.

George C. Sargent and Morrison & Cope, for plaintiff in error.

Charles Page, E. J. McCutchen, Samuel Knight, and C. Irving Wright, for defendant in error.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge, after making the foregoing statement, delivered the opinion of the court.

The questions presented for our consideration are of a legal character, and arise upon exceptions taken to the charge of the court. The points raised by the assignments of error and discussed by the respective counsel are numerous, but some of them are dependent upon the views that may be taken by the court as to the others. The specific assignments of error may therefore be materially reduced.

There is no real controversy as to the facts, but there is a wide diversity of opinion between the respective counsel as to the principles of law applicable thereto. The case is somewhat complicated, and can only be made clear by a thorough comprehension of the several business transactions, and a careful consideration of the situation of the respective parties, as well as their real intent in their business dealings with each other.

1. Did the court err in charging the jury—

"That the liability of the partners of a firm established and duly domiciled, and having a place of business in California, although transacting business in foreign places as well, is governed by the law of California, in the absence of any express provision to the contrary known to the creditor of such firm. In the case at bar the contracts for the merchandise in question, with the payments of money in connection therewith, were all to be performed in England, and are governed by the law of England as to their interpretation, and liability of the persons entering into such contracts, respectively; but the liability of the partners of the persons so respectively entering such contract is governed, as I have just stated, by the laws of this state. You should therefore entirely ignore all testimony regarding the laws of Costa Rica offered in evidence in this case. There has been some testimony concerning the law in Costa Rica with respect to the formation of partnerships and the liability of partners. All those questions that were involved in that matter have been withdrawn from your consideration."

Mr. Easton's liability originally arose out of the agreement of copartnership signed and entered into by him and his copartners in San Francisco, Cal. It is shown that the copartnership had a place of business, and carried on a trade at said place. The mere fact that said copartnership also engaged in and carried on a business at San Jose de Costa Rica does not change the status of Mr. Easton's liability as a copartner of the firm. It does not appear that any steps were taken by the firm to comply with the Costa Rican Code as regards other species of partnership, so as to make it an "account in participation," which is limited to cases where the credit of the dormant partner is not at all utilized in the dealings of the firm with third parties. King v. Sarria, 69 N. Y. 24, 25 Am. Rep. 128; Lawrence v. Batcheller, 131 Mass. 504, 509; Cutler v. Thomas, 25 Vt. 73, 76.

By what laws was the order of March 30, 1898, to be governed —those of England or of Costa Rica? The contention of the plaintiff in error is that the contract for the goods contained in this order was made in Costa Rica, and that the laws of that country

govern. The principal case relied upon to sustain his position is that of Liverpool Steam Co. v. Phenix Ins. Co., 129 U. S. 397, 435, 9·Sup. Ct. 469, 32 L. Ed. 788. It was there declared that the law of the place where a contract is made governs its nature, obligation, and interpretation, unless it appears that the parties, when entering into the contract, intended to be bound by the law of some other country. Mr. Justice Gray, who prepared the opinion of the court, deemed it appropriate to refer to the various decisions rendered in England as to what law should prevail in a case of a conflict of laws concerning a private contract, and declared that the rule was concisely and exactly stated by Sir William Blackstone as follows:

"The general rule, established ex comitate et jure gentium, is that the place where the contract is made, and not where the action is brought, is to be considered in expounding and enforcing the contract. But this rule admits of an exception, when the parties (at the time of making the contract) had a view to a different kingdom. Robinson v. Bland, 1 W. Bl. 234, 256, 258; s. c., 2 Bur. 1077, 1078."

And then refers to the various decisions in England and America in support of this rule. After a reference to all these authorities, it is said:

"This review of the principal cases demonstrates that according to the great preponderance, if not the uniform concurrence, of authority, the general rule that the nature, the obligation, and the interpretation of a contract are to be governed by the law of the place where it is made, unless the parties at the time of making it have some other law in view, requires a contract of affreightment, made in one country between citizens or residents thereof, and the performance of which begins there, to be governed by the law of that country, unless the parties, when entering into the contract, clearly manifest a mutual intention that it shall be governed by the law of some other country."

The rule announced in this case, as well as in the other authorities cited and relied upon by the plaintiff in error, is not applicable to the case in hand, because the facts of those cases are essentially different. All the authorities agree that an exception to the rule exists where the contract is made in one state or sovereignty, to be performed in another. In such cases the general rule is that the contract is governed by the law of the place of performance.

In Minor on Conflict of Laws, § 155, the author says:

"The essential elements or circumstances around which all the incidents of contracts revolve are (1) the making of the contract; (2) the consideration supporting the contract: and (3) the performance of the contract. * * * Everything relating to the making of the contract is to be governed by the law of the place where it is made; everything relating to the performance of the contract is to be controlled by the law of the place of performance; and, wherever the legality or the sufficiency of the consideration is the subject of the inquiry, the law of the situs of the consideration is to govern."

The order of March 30th was taken in Costa Rica by Thomas Wing, who had authority from defendant in error "to take orders, receive payments, and make any needful business arrangements." The testimony in relation to this order does not show that any contract for the purchase of the goods was ever made, other than the contract, understanding, agreements, and course of dealing entered into previously between the parties. And unless the mere

fact that the agent of the defendant in error took the order when he was in Costa Rica, it should be governed by the same rules as other orders previously given. The order itself says, "terms as before."

In the determination of this question, we shall not stop to consider whether the defendant in error is to be treated as an agent for the firm, or whether their relations were to be governed by the rules relating to vendors and vendees. It affirmatively appears that the goods were purchased by the defendant in error in England; that the money for their purchase was to be by it advanced in England, as was also the money for the "prepayment of freight, insurance, and other charges." We are of opinion that the question under consideration, as applied to the facts of this case, must be governed and controlled by the principles and rules of law announced in London Assurance v. Companhia De Moagens, 167 U. S. 149, 160, 17 Sup. Ct. 785, 42 L. Ed. 113, which was a contract of insurance. The court said:

"Under the circumstances, we think that this contract of insurance is to be interpreted according to the English law. The appellant is an English company. It made the contract in Philadelphia, by its agents, and that contract, by its terms, was to be performed in England. The parties to it understood and agreed that, in case of loss or damage to the interest insured under the certificate, the same was to be reported to the corporation at London, and be paid in sterling at its office in the Royal Exchange in the city of London, and the claims were to be adjusted according to the usages of Lloyds, but subject to the conditions of the policy and contract of insurance. Generally speaking, the law of the place where the contract is to be performed is the law which governs as to its validity and interpretation. Story, in his work on Conflict of Laws, § 280, says: 'But where the contract is, either expressly or tacitly, to be performed in any other place, there the general rule is, in conformity to the presumed intention of the parties, that the contract, as to its validity, nature, obligation, and interpretation, is to be governed by the law of the place of performance.'"

Story, at section 282 (8th Ed.), states that, although the general rules in relation to this subject are well established, yet the application of them is attended with many difficulties, because in cases of a mixed nature it is frequently a serious question which rule should prevail. And in subsequent sections makes several illustrations of the different applications of the rule. Among others applicable to this case, at section 283, he says:

"One of the most simple cases is where two merchants doing business with each other reside in different countries, and have mutual accounts of debt and credit with each other for advances and sales. * * * If the business transactions are all on one side, as in case of sales and advances made by a commission merchant in his own country for his principal abroad, there the contracts may well be referred to the country of the commission merchant, and the balance be deemed due to him according to its laws."

Again, at section 285, in speaking of the relation of principal and agent:

"A merchant in America orders goods to be purchased for him in England. In which country is the contract to be deemed complete, and by the laws of which is it to be governed? Casaregis has affirmed that in such a case the law of England ought to govern, for there the final assent is given by the person who receives and executes the order of his correspondent."

137 F.—34

See, also, Andrews v. Pond, 13 Pet. 65, 78, 10 L. Ed. 61; Howenstein v. Barnes, 5 Dill. 482, Fed. Cas. No. 6,786; Weil v. Golden, 141 Mass. 364, 368, 6 N. E. 229; Miller v. Tiffany, 1 Wall. 298, 310, 17 L. Ed. 540; Bedford v. Eastern B. & L. Ass'n, 181 U. S. 227, 242, 21 Sup. Ct. 597, 45 L. Ed. 834; Wharton on Conflict of Laws (2d Ed.) § 401.

Under all the facts and circumstances of this case, we are of opinion that the order in question, as well as the others previously given, is to be governed by the law of England, and that the charge of the court was correct.

There was no proof as to what the law of England was, and, in the absence of proof upon that point, it will be presumed to be the same as that of California. See Brown v. S. F. Co., 58 Cal. 426, 428; Marsters v. Lash, 61 Cal. 622, 624; Shumway v. Leakey, 67 Cal. 458, 460, 8 Pac. 12; Mortimer v. Marder, 93 Cal. 172, 28 Pac. 814; Pierce v. So. Pac., 120 Cal. 156, 47 Pac. 874, 52 Pac. 302, 40 L. R. A. 350; Conn. Life Ins. Co. v. Union Trust Co., 112 U. S. 250, 254, 5 Sup. Ct. 119, 28 L. Ed. 708.

2. Did the court err in charging the jury that:

"As to defendant Easton, if you believe that plaintiff, acting as a purchasing agent of the firm of Schwartz, Lowe & Co., bought the goods of which these consignments consisted, before receiving information concerning Mr. Easton's retirement from the firm, then, subject to a lien which plaintiff might have for their price, these goods became the property of said firm of Schwartz, Lowe & Co., and defendant Easton is liable therefor, although the shipment of the goods to Costa Rica was made subsequent to the receipt of the information that Mr. Easton was no longer connected with the firm of Schwartz, Lowe & Co. Under the circumstances of this case, I instruct you further that the title to the goods, wares, and merchandise sold by the plaintiff, and consigned to the firm of Schwartz, Lowe & Co., passed to the latter as soon as such merchandise was delivered to the common carrier in England for transportation, regardless of the time when the bill of lading therefor was mailed to Costa Rica."

It will be observed that this instruction is very broad, and covers many questions which have been elaborately argued by counsel. The latter part of it is the most important, and, if the principle announced therein is correct, it will obviate the necessity of specifically noticing several other assignments of error relied upon by the plaintiff in error.

As was said by the court in Havens v. Grand Island L. & T. Co., 41 Neb. 153, 155, 59 N. W. 681:

"The general rule doubtless is that the delivery of goods to a carrier consigned to the purchaser is a delivery to the purchaser, and that the title of the goods so delivered to the carrier at once vests in the purchaser; but this rule is by no means universal, and, whether applicable in any case, depends upon the facts, circumstances, and the contract between the seller and the purchaser in the case."

As we have heretofore stated, the facts in this care are not in dispute. Under arrangements made between the parties, the defendant in error purchased the goods for Schwartz, Lowe & Co. It took out policies of insurance in favor of Schwartz, Lowe & Co. It prepaid the freight, shipped the goods, and advanced for Schwartz, Lowe & Co. all the various sums that were required in

the performance of such services, and charged those sums to Schwartz, Lowe & Cò. These moneys were advanced by defendant in error to said copartnership, as their agent, for a commission of 5 per cent. Did not these transactions constitute a debt for which the firm was liable?

In Bibb v. Allen, 149 U. S. 481, 498, 499, 13 Sup. Ct. 950, 37 L. Ed. 819, the court said:

"It is a well-established principle, which pervades the whole law of principal and agent, that the principal is bound to indemnify the agent against the consequences of all acts done by him in the execution of his agency, or in pursuance of the authority conferred upon him, when the actions or transactions are not illegal. Speaking generally, the agent has the right to be reimbursed for all his advances, expenses, and disbursements incurred in the course of the agency, made on account of or for the benefit of his principal, when such advances, expenses and disbursements are reasonable, and have been properly incurred, and paid without misconduct on the part of the agent. * * * It is another general proposition, in respect to the relation between principal and agent, that a request to undertake an agency or employment, the proper execution of which does or may involve the loss or expenditure of money on the part of the agent, operates as an implied request on the part of the principal not only to incur such expenditure, but also as a promise to repay it."

There is no pretense that the acts of the defendant in error in this case were illegal.

In Field v. Banker, 9 Bosw. 467, 476, the facts are different from the case at bar, but the principles for which the defendant in error here contends are clearly announced. There the plaintiffs were engaged in the business of purchasing hardware abroad, upon a commission, and received an order from the defendant as follows, "I annex memorandum of chains, which please forward by an early packet, giving the preference to the 'Black Ball Line,' at lowest rate of freight," and annexed thereto a description of the goods. The Supreme Court, in the course of its opinion, said:

"If the contract was one of mere sale and delivery, it was the business of the defendant to select the carrier, or, if he left the choice to the plaintiffs, to be ready to insure his interest at the instant of shipment. The carrier was the agent of either the defendant or the plaintiffs in such case; if of the latter, the delivery was not complete until the goods arrived in New York; if of the former, it was so the moment they were put on board. But there was no such contract as that between vendor and vendee. The plaintiffs were authorized to buy and ship as the defendant's agents. They might have used his name as purchaser, and left him alone responsible. It is true, they personally assumed the responsibility to the sellers of the chains, but this did not alter the relation of principal and agent. From the domestic who is sent to a tradesman to purchase articles for daily use, to the agents employed to buy millions, the rule is the same. The moment the purchase is made for the principal, he owns the property bought, from the time of its delivery to his agent, and is bound to reimburse the latter for moneys expended by him in the purchase. The property is at his risk, and not his agent's, whatever responsibility the agent may be under for the care and safe transmission of the goods afterwards. They are his property, subject to the lien for the purchase money, and not his agent's."

In Mee v. McNider, 109 N. Y. 500, 503, 17 N. E. 424, in the course of the opinion, the court said:

"On the other hand, the vendor is to be reimbursed for his advances at the same time and in the same manner that he receives payment for the

goods. Only one condition is to be performed—that of shipment by steamer. * * * On the part of the vendor the shipment by steamer was an effectual appropriation of the cocoa to the buyer, and at that moment the agreement on the vendor's part was executed. The plain obligation of the purchaser, as defined by the written contract, then attached, and he was bound to accept and pay for the cargo at the price named and in the manner specified."

See, also, Halliday v. Hamilton, 11 Wall. 561, 564, 20 L. Ed. 214; McNeal v. Braun, 53 N. J. Law, 618, 23 Atl. 687, 26 Am. St. Rep. 441.

In Neimeyer v. Railroad Co., 54 Neb. 321, 332, 74 N. W. 670, 40 L. R. A. 534, et seq., the court discussed the question in all its various phases under different state of facts, and cited numerous authorities with reference thereto. In the course of the opinion the court quotes the rule announced in Benjamin on Sales, as follows:

"Where goods are shipped, and by bill of lading the goods are delivered to the order of the seller or his agent, the seller is prima facie deemed to reserve the right of disposal."

And adds:

"But Neimeyer & Co. at the time they shipped these goods did not cause them to be consigned to themselves, to their agent, or to their order. On the contrary, they caused these goods to be consigned to Deitz, the vendee of their vendees, and this fact authorizes the inference that it was then and there the intention of Neimeyer & Co. that the title to the goods should pass upon their delivery to the carrier for transit to their vendees' vendee. Upon this subject the cases are all one way."

When the defendant in error purchased the goods and delivered them to the common carrier, and paid the freight thereon, to be forwarded to Schwartz, Lowe & Co., at Costa Rica, it performed all that it was required to do, by virtue of its agreement with that firm, to entitle it to recover the amount due from said firm for advances by it made for the purchase of the goods, the payment of freight, insurance, etc., with 5 per cent. commission.

The instruction of the court under review, is correct.

3. Plaintiff in error claims that the court erred in its charge to the jury in relation to what constitutes notice, actual or constructive, of the dissolution of a copartnership, and that the instructions as to the partnership liability were contradictory, and that he is entitled upon these grounds to have the case reversed. It is undoubtedly true, as a general proposition, that a party is entitled to have instructions to the jury clear and consistent with themselves. But the real question in the present case is whether the instructions were in fact so misleading or contradictory as to show that the jury could possibly have been misled thereby to the prejudice of the plaintiff in error. Having held that the court did not err in giving the last instruction discussed, as to the time when the title of the goods passed to Schwartz, Lowe & Co., it necessarily follows that, if the court erred in giving other instructions in conflict therewith, it was an error in favor of the plaintiff in error, of which he cannot complain.

The telegram from the bank, received on December 3, 1898, was the first intimation that defendant in error received that there had been any change in the firm. The testimony in the record shows

that prior to that time the goods embraced in the order of October 1, 1898, as well as all goods for which any claim is made in this action, had been purchased by the defendant for Schwartz, Lowe & Co. As a matter of fact, the goods were delivered to the common carrier for transportation prior to that time. The goods charged in the invoice of December 16th were delivered to the steamship Georgic, and a bill of lading taken, to the order of Schwartz, Lowe & Co. on December 2, 1898. This was the last shipment for which any recovery is sought.

It is fair to presume that the instructions given by the court, which are claimed to be adverse or in conflict with the one which we have sustained, accounts for the amount of the judgment against Easton being less than against the Schwartzes. But whether that be true or not, the fact remains that the instructions of the court, which left it to the jury to determine whether the telegram from the bank was sufficient to put the defendant in error upon inquiry as to the dissolution of the copartnership, whether it used reasonable diligence in detaining the goods, pending such inquiry, or made efforts to minimize the loss, were more favorable to the plaintiff in error than the law would warrant under the particular facts of this case.

In the light of all the facts, the plaintiff in error is estopped from denying his liability for the debt.

The rule is well settled that where a partnership is dissolved, or one or more of its members retires from the firm, without giving notice to the party with whom the partnership is dealing, the power of each member to bind the firm remains in full force, although, as between themselves, a dissolution or retirement is a revocation of the authority of each to act for the others. Lind. on Part. § 407; Parsons on Part. (4th Ed.) § 324; Story on Part. (7th Ed.) § 162; Collyer on Part. § 530; McLemore v. Ranken M. Co. (Miss.) 8 South. 845; Rose v. Coffield, 53 Md. 18, 23, 36 Am. Rep. 389; Ruiz v. Norton, 4 Cal. 355, 358, 60 Am. Dec. 618; Williams v. Bowers, 15 Cal. 321, 76 Am. Dec. 489; Block v. Price (C. C.) 32 Fed. 562, 564.

If any fraud was committed by Lowe, the plaintiff in error, instead of the defendant in error, must suffer. Easton relied upon Lowe to give the notice of the dissolution and to pay the outstanding debts against the partnership. Lowe did neither. The fraud of Lowe was against the firm. The firm allowed Lowe to hold himself out as a partner in dealing with third persons, without notice, after the dissolution, and cannot complain if they be held for the debts incurred prior to any notice of the true condition of the partnership affairs. The rule is universal that, where one of two innocent parties must suffer, it must be he whose misplaced confidence enabled the wrong to be committed. The defendant in error owed no duty to lessen the debt or to minimize the loss to the members of the firm who had, as between themselves, withdrawn from the firm without giving any notice of such dissolution. It was not bound to stop any of the goods in transitu, which it had bought and delivered to the firm in the usual course of dealing. It was not in any way responsible to the firm for the wrongdoing of Lowe toward them. It certainly was not bound to

stop the goods in transitu, even if it had the power to do so, and thereby suffer a loss in order to protect Easton, and relieve him from any part of his liability. Mr. Easton was not a party to any wrongdoing, but his failure to notify the defendant in error has estopped him, as before stated, from denying the debt. He cannot hold the defendant in error responsible for the wrongful acts of Lowe towards himself and his copartners.

It is only necessary to add that we find no error in the refusal of the court to give the instructions requested by the plaintiff in error, or in any of the other assignments of error, not governed by the principles we have already announced, that would justify a reversal of the judgment.

The judgment of the Circuit Court is affirmed, with costs.