DEXTER HORTON NAT. BANK OF SEATTLE, WASH., v. HAWKINS et al.

(Circuit Court of Appeals, Ninth Circuit. February 5, 1912.)

No. 2,018.

BANKS AND BANKING (§ 77*)—SHIPMENT OF MONEY AND BULLION—STOPPAGE IN TRANSIT.

An Alaska bank, being indebted to a correspondent at Seattle, delivered packages of money and bullion to an express company for delivery to the correspondent for credit on account. A few days later the correspondent stopped payments on the bank's drafts, causing the bank to suspend business and to be placed in receivership. *Held*, that the receivers were entitled to stop the shipment in transit; being entitled to its possession as against the correspondent, since title had not passed to the bank; the correspondent had no lien upon the shipment or equitable right thereto, though it honored checks and drafts of the other bank; the credit having been extended in the ordinary course of business, pursuant to an arrangement between the parties, and not in reliance upon the shipment.

[Ed. Note.—For other cases, see Banks and Banking, Dec. Dig. § 77.*]

Appeal from the District Court of the United States for the Fourth Division of the Territory of Alaska.

Petition by Dexter Horton National Bank of Seattle, Washington, against F. W. Hawkins and others. From a judgment denying the petition, petitioner appeals. Affirmed.

See, also, 190 Fed. 924.

The appellant is a national bank doing business at Seattle in the state of Washington. In March, 1908, the Fairbanks Banking Company of Nevada

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

was incorporated under the laws of that state and commenced the transaction of a general banking business at Fairbanks, Alaska. At that time a banking corporation known as the Washington Alaska Bank was also doing business at Fairbanks. In September, 1909, the Fairbanks Banking Company purchased the stock of the Washington Alaska Bank. On October 1, 1910, the business of those two banking corporations and their assets were amalgamated, and the Washington Alaska Bank withdrew from that line of business. About the same time the Fairbanks Banking Company of Nevada changed its name to Washington Alaska Bank of Nevada, and thereafter carried on the banking business at Fairbanks. Prior to August, 1910, the correspondent bank and depositary of the Fairbanks Banking Company in Seattle was the Washington Trust Company, a corporation engaged in the banking business at that place; but upon the amalgamation of that bank with the appellant, which occurred in August, 1910, the appellant became the Seattle correspondent and depositary of the Fairbanks Banking Company. In order for the latter company to transact its banking business, it became necessary for it to establish a credit for overdrafts with its correspondent bank, and for that purpose it deposited with the appellant, as collateral, certain shares of stock which it owned in the Gold Bar Lumber Company, valued by the appellant at $300,000. This was done in August, 1910, and said stock still remains so pledged to the appellant. Under the contract for extension of credit to the Fairbanks Banking Company by the appellant, it was understood and agreed that the former should, from time to time, deposit with the appellant money, gold, bullion, checks, drafts, etc., and that the appellant would honor all drafts and telegraphic requests for payment of money issued and made upon it by the Fairbanks Banking Company. That arrangement subsisted after the change of the name of the Fairbanks Banking Company to that of Washington Alaska Bank of Nevada. After August 1, 1910, the Washington Alaska Bank of Nevada, under that arrangement, continued to draw drafts and make telegraphic requests of the appellant for the payment of money, and from time to time it made deposits with the appellant of money, coin, gold, bullion, drafts, etc.

During the month of October, 1910, the Washington Alaska Bank had large amounts in its favor upon the books of the appellant, but in November and December following the balances were the other way. On December 15th the Alaska Bank owed the appellant for overdrafts $30,025.07, on December 27, 1910, $131,392.15, and on January 3, 1911, $143,260.13. At intervals from December 15 to December 23, 1910, the appellant notified the Alaska Bank of the overdraft of its account and the amount thereof, and it requested that it make deposits to reduce the same. The Alaska Bank answered by telegraph promising to do so, and on December 26th, 29th, and 31st, respectively, it delivered to the Yukon Express Company, with charges prepaid, three packages of gold, bullion, and currency, amounting in all to $101,000; the packages being marked and directed to the appellant at Seattle. Before forwarding said packages, the Alaska Bank insured the same, loss if any payable to the appellant, and paid the charges for the insurance. The policies of insurance were issued in duplicate; the originals were retained by the Alaska Bank, and the duplicates were sent to the appellant. The said packages were carried by the express company as far as Cordova en route to Seattle. On December 28, 1910, the Alaska Bank notified the appellant by telegraph that the three packages and the treasure therein contained had been so sent by express, but the Alaska Bank retained the express receipts. On January 3, 1911, the appellant stopped payments on the drafts and telegraphic requests for payments of money made upon it by the Alaska Bank, the result of which was that the latter bank on the morning of January 5, 1911, was compelled to close its doors and suspend business. On the same day, at the suit of creditors, receivers of the Alaska Bank were appointed. On January 7, 1911, those creditors and the receivers presented to the court below a sworn application, supported by affidavit, for a writ of assistance, alleging that the coin, bullion, and currency so shipped by express were the property of the Alaska Bank, and were yet within the territory of Alaska, and subject to the jurisdiction of the court, and that the

express company had refused to surrender the same to the receivers. The writ was issued, and the property was taken at Cordova and was delivered to the receivers. The appellant had no notice of these proceedings. On January 19th it filed its petition in the court below setting up its claim of right to said coin, currency, and bullion, and prayed that the same be restored to its possession. The court made an order directing that a hearing be had on the petition. The hearing was had, and the court entered an order denying the prayer of the petition. The court made findings which embraced the statement of facts hereinabove set forth, and also the finding that, in receiving the express packages at Fairbanks, the express company then and there became the agent of the Alaska Bank, and not the agent of the appellant; that, under the agreement between the two banks and the invariable custom, shipments of money, bullion, or evidences of indebtedness by the Washington Alaska Bank of Nevada and the appellant at Seattle were credited to the former bank by the appellant, and title to such shipments passed to the latter when, and only when, actually received over the counter of the appellant's bank in Seattle, and interest on overdrafts continued to be computed by the appellant until all such deposits or payments were actually received and in its custody.

A. R. Heilig and Peters & Powell, for appellant.

Louis K. Pratt, Thos. R. White, and Albert Fink, for appellees.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

GILBERT, Circuit Judge (after stating the facts as above). The whole question of the right of the receivers to stop the money and bullion in transitu depends upon the answer to the question: To whom did the money and bullion belong while in the possession of the express company? Many decisions are cited concerning the title to property while in the hands of a carrier, on its way from the seller to the buyer, and they sustain the general rule that a delivery of goods by the seller to a carrier designated by the buyer, or to the carrier usually employed in the transportation of goods from the place of the seller to that of the buyer, is prima facie a transfer of title to the buyer, subject to the carrier's lien for freight, and to the seller's right to stop in transitu goods that have not been paid for, in case of his discovery of the buyer's insolvency. The appellant contends that the general rule is applicable here, and that the delivery to the express company was a delivery to the appellant. The appellee contends, on the other hand, that the question is determined by the intention of the parties, and that the facts found by the court and the facts disclosed by the evidence indicate that the intention was that the title to the property should not pass until the actual receipt of the property by the appellant.

In United States v. Andrews, 207 U. S. 229, 240, 28 Sup. Ct. 100, 104 (52 L. Ed. 185), it was said:

"That as a general rule the delivery of goods by a consignor to a common carrier for account of a consignee has effect as delivery to such consignee is elementary. That where a purchaser of goods directs their delivery for his account to a designated carrier, the latter becomes the agent of the purchaser, and delivery to such carrier is a legal delivery to the purchaser, is also beyond question. Certain, also, is it that when on the delivery of goods to a carrier bills of lading are issued for the delivery of the goods to the consignee or his order, the acceptance by the consignee of

such bills of lading constitutes a delivery. Of course the presumption of delivery arising from the application of any or all of these elementary rules would not control in a case where by contract it clearly appeared that, despite the shipment, the goods should remain at the risk of the consignor until arrival at the point of ultimate destination."

In McNeal v. Braun, 53 N. J. Law, 617, 23 Atl. 687, 26 Am. St. Rep. 441, after reviewing the decisions, the court said:

"It will also be found that the rule uniformly adopted in the line of decisions is that the risk of loss in transportation depends upon the nature of the transaction, the terms of the contract, and the intention of the parties. In Dunlop v. Lambert, 6 Clark & F. 600, Lord Cottingham said: 'When the party undertaking to consign undertakes to deliver at a particular place, the property until it reaches that place and is delivered according to the terms of the contract is at the risk of the consignor.'"

In some of the decisions controlling evidence of the intention of the parties has been found in the disposition made of the bill of lading; that is to say, whether the bill of lading was sent to the consignee or retained by the consignor. In others it has been found in the proof of the method of former similar transactions between the parties. Such evidence is found in the record here. Four months before the consignment of money and bullion in this case, the Alaska Bank had shipped to the appellant two boxes of bullion for credit on its account. While in transit the contents of one of the boxes were stolen. The appellant, acting as the agent for the Alaska Bank to collect the insurance on the stolen bullion, required the latter to give it a written authorization to collect the money due on the policy and a written release from all liability in giving a receipt therefor, and it was not until the money was so collected from the insurance company that the appellant gave credit therefor on its books. The appellee points also to other circumstances as indicating the intention, such as the fact that no bill of lading was transmitted to the appellant, that the Alaska Bank insured the money and bullion while in transit, that the appellant charged interest against the Alaska Bank until the actual receipt of money in Seattle, and it argues that the appellant, being amply secured, had no inducement to assume the risk of the loss of money and bullion in transit.

But we think that decisions in cases arising under sales of goods and the transportation thereof, while they tend, upon the analogous principles involved, to sustain the decision of the court below, are not necessarily controlling of the question here under consideration. The case is not that of a sale of goods by the Alaska Bank to the appellant, but it is a case of an attempt to pay a debt. The Alaska Bank was indebted to the appellant in a large sum of money. The debt was payable at the appellant's bank in Seattle. The Alaska Bank placed $101,000 in the hands of the express company to be transmitted to the appellant at its place of business in Seattle, to be there received and credited on the account. If the money and bullion had been lost in transit, whose loss would it have been? There can be no doubt that it would have been the loss of the Alaska Bank. That bank could not say that the appellant had been paid from the mere fact that it had placed the money in the hands of the express company, consigned

to the appellant at the place where the debt was payable. The express company might, it is true, have been made the agent of the appellant to receive and transmit the money; but there is nothing in the evidence to show that that was done.

In 22 Am. & Eng. Enc. of Law (2d Ed.) 535, it is said:

"When a remittance is made through a third person, the question whether the money while in transit is at the risk of the debtor or the creditor depends entirely upon the question of the agency of the person through whom the money is sent. If he is acting as the authorized agent of the creditor, the money is at the risk of the creditor; but if he is acting as the agent of the debtor, or was not authorized by the creditor to receive the money, it is at the risk of the debtor."

The money and bullion being in the possession of the express company as the agent of the Alaska Bank, the latter had the right to recall the shipment and take possession of the money and bullion at any time before the delivery thereof to the appellant, and the receivers of the Alaska Bank succeeded to that right.

We find no ground for sustaining the appellant's contention that it has a lien upon the money and bullion, or an equitable right to the possession thereof from the fact that it honored checks and drafts of the Alaska Bank, and extended credit to that bank in a large sum, relying upon the shipment of the money and bullion. The credit so extended was given in the ordinary course of business, pursuant to an arrangement that had been made between the parties, and not in reliance upon any shipment which had actually been made. It was given upon the promise of the Alaska Bank to send a large remittance; but, before that remittance was actually sent, the overdraft on which it was to apply amounted to more than the sum here involved.

The judgment is affirmed.