[No. 12019.  *En Banc.*  August 4, 1915.]

DEXTER HORTON NATIONAL BANK OF SEATTLE, *Respondent,*
v. WASHINGTON-ALASKA BANK et al., *Appellants.*[1]

CORPORATIONS—STOCK—PLEDGE OF STOCK—EVIDENCE—SUFFICIENCY.
A pledge of mining stock as collateral security for advances made by
one bank to another is sufficiently established by an indefinite oral
agreement to the effect that the stock, left in possession of the
pledgee, was to be held to protect the pledgee for advances made to
the pledgor.pending negotiations for an extensive credit or permanent
loan, which failed of consummation; especially in view of the sub-
sequent attitude of receivers of the pledgor, in litigation with the
pledgee, whereby the receivers established by a judgment that the
advances were made solely in consideration of such pledge of the
stock as collateral security, which exceeded in value the amount of
the advances; and thereafter, by virtue of such judgment and claim
of collateral, the receivers contracted with the pledgee with refer-
ence to the stock on the assumption that it had been pledged and
was held as collateral.

JUDGMENT—RES JUDICATA—MATTERS CONCLUDED.  Where receivers
of an insolvent bank impounded money in transit that had been sent
to a creditor bank to apply on overdrafts and advances, a judgment
in favor of the receivers, based on their claim that the advances had
been made on the sole consideration of mining stock theretofore
pledged therefor and then held by the creditor bank as collateral
security exceeding in value the amount of the advances, is conclusive
that the mining stock had been pledged by the insolvent as collateral
for the advances, and precludes the receivers from making a con-
trary claim in subsequent litigation to foreclose the pledge.

Appeal from a judgment of the superior court for King
county, Albertson, J., entered January 16, 1914, in favor
of the plaintiff, in an action to foreclose the lien of a pledge,
tried to the court.  Affirmed.

*Lyons & Orton* and *Hughes, McMicken, Dovell & Ramsey,*
for appellants.

*Peters & Powell,* for respondent.

MORRIS, C. J.—This is an action to determine the rights of
the parties in ninety-six shares of the capital stock of the

[1]Reported in 150 Pac. 1176.

Gold Bar Lumber Company, respondent claiming to hold this stock as a pledge for an indebtedness of $104,465.62, with accrued interest, and praying for foreclosure. Appellants deny the pledge, claiming the stock was left with respondent only for safe-keeping, and pray for its re-delivery. The judgment of the lower court established the indebtedness at $126,907.80, sustained the pledge, and ordered its foreclosure.

Prior to October 1, 1910, there were two banks at Fairbanks, Alaska, one known as the Fairbanks Banking Company, and the other as the Washington-Alaska Bank. On October 1, the Fairbanks Banking Company took over all the assets of the Washington-Alaska Bank, and thereafter the consolidated banks were known as the Washington-Alaska Bank. On January 5, 1911, the Washington-Alaska Bank was declared to be insolvent and two receivers were appointed, both of whom were displaced prior to the commencement of this action by F. G. Noyes, the present receiver. Prior to August 1, 1910, the Seattle correspondent of the Alaska banks was the Washington Trust Company, which on that day consolidated with the respondent, and the account of the two Alaska banks was transferred to respondent, the respondent thereafter acting as the Seattle correspondent of the Alaska banks. To avoid confusion the Alaska banks will hereafter be referred to as the appellant, and the Seattle bank as the respondent.

In order to properly conduct its banking business during the winter months, it was necessary for appellant to obtain a large credit with respondent or other outside banks, and in order to secure this winter credit, it had been customary for several years for E. T. Barnette, the president of appellant, to guarantee the overdraft in some form mutually satisfactory, and also by pledging the Gold Bar stock as collateral. Prior to the transaction here involved, Barnette had resigned as president of appellant and had removed to California. His resignation, however, had not yet been accepted

and he was still nominally the president of appellant. This was the fact prior to the consolidation of the Seattle banks, the main issue now being whether or not the Gold Bar stock was so pledged with respondent after the consolidation of the Seattle banks. The Gold Bar stock first came into possession of respondent on September 15, 1910, when it was brought to the bank by one Armstrong at the request of Barnette, and receipt was issued reciting that it held the stock subject to the order of Barnette. There was no indebtedness between appellant and respondent at this time, and the evidence discloses no purpose for leaving this stock with respondent, unless inferentially it might be convenient if it should be necessary to make use of it as collateral.

In December, 1910, Mr. Jackson, vice president and manager of appellant, came to Seattle to arrange for the customary winter credit. He brought with him a power of attorney issued by appellant, concerning which no question is raised, authorizing him to pledge the Gold Bar stock or make any other use of it in order to obtain the necessary winter credit. This power of attorney is very full, and under it Jackson's authority to pledge the stock could not be questioned. Jackson says he had two plans in view, one to secure the indorsement of Barnette, then residing at Los Angeles, and the other the pledge of the Gold Bar stock. Jackson had several interviews with Mr. Parsons, representing the respondent, in which they discussed the amount of overdraft appellant would require, which was fixed by Jackson at the sum of $250,000. Parsons was unwilling to accede to so large a credit. Jackson finally left for California to interview Barnette in regard to the matter, requesting respondent to honor all drafts of appellant during his absence and pending final negotiations. We quote from his testimony: "Just the exact words I cannot remember. I did not put much thought to it at the time; stating he was protected by the Gold Bar stock." Jackson returned to Seattle with Barnette on December 14. They went to the respondent bank

and informed Parsons they were ready to close the matter up. Negotiations were continued until December 20, when Parsons informed Jackson and Barnette that respondent would not extend the overdraft as requested, which at this time had been increased to $350,000. Jackson sought the aid of other banks, but being unable to arrange for the required credit, he notified the appellant and it closed its doors.

Both Parsons and Jackson are very indefinite as to what was the exact language in which the Gold Bar stock was pledged. They both say there is no question but that it was done, but fail to state how or when it was done. There was no written pledge, and the matter must rest upon these indefinite, numerous conversations that took place pending the negotiations for the overdraft. Parsons says that, about December 6, prior to Jackson's leaving for California, Jackson said to him, "In the meantime, if you will take care of our advances you shall hold the Gold Bar stock as collateral to the overdrafts and such advances as you may make, until such time as I perfect a definite and permanent loan for the $250,000." It is difficult to state fairly within any small compass the testimony of either Jackson or Parsons, or to show just what was the mutual agreement between them as to the pledging of the Gold Bar stock. As before stated, they both agree that it was pledged, but their testimony seems to be based more upon their common understanding that such was the fact than upon any definite contract to that effect. The matter is rendered still more confusing by the fact that, subsequent to the failure of appellant, Parsons and Jackson endeavored to put in writing the result of their negotiations. The only reference to the Gold Bar stock in this writing is this: "Before Mr. Jackson left for Los Angeles, approximately December 6, 1910, he stated that he would see E. T. Barnette and arrange for a credit of $250,000. In the meantime until he returned to Seattle, we [meaning respondent] would be fully protected on our advances by Gold Bar stock." Barnette testified that, so far as his knowledge goes, the Gold

Bar stock was not given as collateral, and that the respond-
ent's relation to it never changed from that indicated when
it was first left by Armstrong for safe-keeping subject to
Barnette's order. As evidencing this, appellant produces an
order written by Parsons December 21, 1910, in which Bar-
nette directs respondent to deliver the Gold Bar stock "which
I left with you for safe-keeping," to Jackson. Respondent's
explanation of this order is that, after respondent declined
to grant appellant the credit required, Jackson indicated
his purpose to endeavor to formulate arrangements if pos-
sible with other Seattle banks, in which event, if successful, it
was thought the Gold Bar stock would be required as col-
lateral, and the indebtedness to respondent growing out of
the advances it had already made would be paid in cash out
of the credit established with such other banks. This arrange-
ment if carried out would leave the Gold Bar stock to be held
by respondent for safe-keeping, as under its original deposit,
and Parsons desired, inasmuch as Barnette still held the orig-
inal receipt, stating the stock was held subject to his order,
to have written authority from him before turning it over
to Jackson.

The confusion as to the real facts concerning the Gold
Bar stock is cleared up, we think, by the subsequent attitude
of the parties. The respondent has retained this stock under
its claim of pledge from December, 1910, to the time this
action was brought in April, 1913. During all this time the
appellant and its receivers have acquiesced in its claim; at
least it has never been disputed, nor has any attempt been
made to obtain its possession. During the latter part of De-
cember, 1910, the appellant delivered $101,000 to an express
company of Fairbanks, Alaska, to be transmitted to respond-
ent to apply as payment upon account. While this money
was in transit and before it had passed from the jurisdiction
of the Alaska courts, the appellant suspended and receivers
were appointed, one of whom was the cashier of appellant.
These receivers immediately sued out a writ of assistance,

and under it obtained possession of the consignment. The respondent appeared in the proceedings growing out of this writ of assistance and set up title to the money and right to its possession. A hearing was had on this petition, at which time the receivers took the position, and sought to establish, that the respondent held this Gold Bar stock as collateral, respondent objecting to going into this upon the ground that it was immaterial. The receivers, however, insisted and the court ruled with them, and in its order and judgment denying respondent's claim to the money seized under the writ of assistance, it recites that the respondent held this stock as collateral. This holding was made upon the evidence then before the court, including telegraphic communications between the receiver and respondent, in which Hawkins, receiver, and prior to its insolvency, cashier of the appellant, testified that, upon his appointment as receiver, he desired to get the respondent to commit itself as to its relation to this Gold Bar stock, and accordingly wired it asking in what capacity it was held, to which respondent answered that it held it as collateral. The respondent appealed from the judgment denying its right to the money seized under the writ of assistance to the circuit court of appeals and, on February 5, 1913 (*Dexter Horton Nat. Bank of Seattle v. Hawkins*, 193 Fed. 363), the appellate court sustained the judgment of the Alaska court, reciting in its statement of the facts that the Gold Bar stock was held as collateral. That this question was material in that proceeding is evident. The receivers contended that respondent advanced credit to appellant solely upon the faith of the Gold Bar stock as collateral, and that the value of this stock far exceeded the amount due; while respondent contended its advances were made both upon the Gold Bar stock as collateral and upon the faith of the shipments that appellant agreed to make from time to time.

If the court had held with respondent that it made its advances partly upon the promise of appellant to remit to it

from time to time, respondent would have thereby been entitled to an equitable lien upon the money.  If, however, the advances were made upon the collateral alone, there could be no such lien.  The circuit court of appeals held that the receivers were entitled to stop the shipment in transit, for the reason that title would not pass to respondent until its receipt of the money, and that it was not entitled to any equitable lien for the reason that it had extended credit in the ordinary course of business, pursuant to an arrangement between the parties by which the Gold Bar stock was held as collateral, and not in reliance upon the faith of future shipments.  The only arrangement between the parties indicated by the record in that case was the arrangement whereby the Gold Bar stock became collateral.  No one sought to establish any other, nor did any one dispute it.  Respondent's objection to showing this collateral agreement was upon the ground that, if established, it gave it no right to the money seized under the writ; that such right could only be enforced upon the theory of an equitable lien based upon its claim of advancing credit upon the faith of the shipment as well as upon the strength of the collateral.

Appellants' attitude is further shown by the fact that, on August 26, 1912, the present receiver made a showing to the Alaska court in which he recites that the respondent holds this Gold Bar stock as collateral, and prays for an order permitting him to enter into negotiations with respondent touching its ultimate disposition.  The court made such an order, reciting as its basis that respondent held this stock as collateral, and the receiver came down to Seattle and entered into a contract with respondent reciting that the appellant is indebted to the respondent in the sum of $129,465.62, and as collateral security holds ninety-six shares of the Gold Bar stock, which the receiver desired should not be sold nor converted into cash without his consent, or prior to June 1, 1913, to which respondent assents in consideration of the present payment of $25,000, and the further promise of the receiver

to pay the balance of a fifty per cent dividend, with interest, as fast as he could obtain available funds, and before December 1, 1912.

No formal agreement is necessary to establish a pledge so long as the agreement be clearly expressed or implied, and while the testimony of Parsons and Jackson might leave the matter in some doubt, it is clear, we think, when aided by all the facts, that there was between them a distinct understanding that respondent was to retain the Gold Bar stock as collateral to any advances it might make pending the determination of the amount of credit it would extend to appellant. The nature of respondent's relation to this stock was more than an incidental, evidentiary matter in the proceeding in the Alaska court. It was one of the matters inquired into by the court to determine respondent's right to a lien upon the shipment of the money, and its right to such lien was denied because, first, it had made advances upon the sole credit of the Gold Bar stock, the value of which exceeded the amount due; and second, that the money was the property of appellant until actually received by respondent. Thus, not only was the relation of respondent to this stock determined, but it is made the basis in part of the court's refusal to grant it the relief it demanded. Under these circumstances, it was a conclusive establishment of the fact between the parties, and the subsequent action of the Alaska court, invested with jurisdiction over the insolvency proceedings, recognizes this fact by citing it as the reason for ordering the receiver to enter into negotiations with respondent to obtain this valuable stock for the benefit of the insolvent estate.

Upon the whole case, we agree with the lower court, and its judgment is affirmed.

Crow, Ellis, Mount, Main, Parker, Fullerton, and Holcomb, JJ., concur.