## TANANA VALLEY R. CO. et. al. v. WASHINGTON-ALASKA BANK.

(Fourth Division. Fairbanks. January 10, 1918.)

### No. 1597.

**1. Banks and Banking ⬅80(4)—Receivers—Creditors' Suits.**

The Washington-Alaska Bank of Fairbanks, Alaska, was indebted to the Dexter Horton National Bank, of Seattle, Wash., in the sum of $126,907.80, and gave the Seattle bank 96 shares of the capital stock of the Gold Bar Lumber Company as security therefor. The Alaska bank failed, and a receiver was appointed therefor. Default was made in the payment to the Seattle bank, which caused the Gold Bar stock to be sold after legal proceedings in Washington for $99,656.04, leaving a balance due the Seattle bank of $27,248.96. The receiver of the Alaska bank had then paid 50 per cent. dividends on the claims owing by the Alaska bank, but had not paid such dividends to the Seattle bank, upon the theory that it was a secured creditor. The Seattle bank filed a petition in the Alaska court, asking to have the receiver of the Alaska bank pay it so much of its deferred 50 per cent. dividends as would pay the balance of $27,248.96 due it. *Held*, under the rule in Merrill v. National Bank, 173 U. S. 131, 19 Sup. Ct. 360, 43 L. Ed. 640, the receiver should pay the Seattle bank so much of its deferred 50 per cent. dividends as would pay its claim in full, crediting thereon the sums so received from the Gold Bar stock.

**2. Banks and Banking ⬅288—Creditors' Suits.**

A secured creditor for a national bank may prove and receive dividends upon the face of his claim as it stood at the time of the declaration of insolvency, without crediting either his collaterals, or collections made thereupon after such declaration, subject always to the proviso that the dividends must cease when, from them and from collaterals realized, the claim has been paid in full.

**3. Bankruptcy ⬅323—Claims—Creditors.**

Under the Bankruptcy Act of 1898, a secured creditor, selling his securities after the filing of the petition, must apply

---

⬅See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the proceeds, other than interest and dividends accrued since the date of the petition, first to the liquidation of the debt with interest to the date of the petition. He cannot first apply such proceeds to interest accrued since the petition.

**4. Bankruptcy ⬤☞323—Bankruptcy—Credits, Application of.**

A secured creditor of a bankrupt can apply interest and dividends accruing on the securities after the date of the petition to interest on the debt accruing after such debt.

**5. Bankruptcy ⬤☞323—Receivers—Bankruptcy—Creditors' Suit—Secured Creditors.**

A secured creditor stands in a different relation to the trust estate than a creditor with security. It was not intended that a little security should fix the status of an account as a secured account in the equitable ratable distribution of the estate among all the creditors.

The petition of the Dexter Horton National Bank for an order of the court directing the receiver of the Washington-Alaska Bank of Nevada to pay to it the sum of $27,246.76, with interest thereon at the rate of 8 per cent. per annum from January 30, 1914, is submitted on the following agreed statement of facts:

1. The petitioner, the Dexter Horton National Bank, of Seattle, Wash., is and at all times hereinafter stated was a national banking association, organized and doing business at Seattle, in the state of Washington, under the United States laws relating to national banks.

2. That on January 5, 1911, receivers were appointed for said Washington-Alaska Bank of Nevada, defendant herein, by the above-named court; that on May 12, 1911, said receivers resigned, and F. G. Noyes was on said last-mentioned date duly appointed as receiver of said defendant bank, and since said time he has been and now is the duly appointed and acting receiver thereof, and of all its property and assets.

3. That on January 4, 1911, the date of the insolvency of said bank as adjudged by said court, there was due and owing by said Washington-Alaska Bank of Nevada to the petitioner an amount of money then not accurately fixed, because reconcilement sheets covering said date had not been received by said banks, but then known by both banks to be in excess of the sum of $129,000, to secure the payment

⬤☞See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of which, with interest, petitioner claimed it held as a pledge certificates for 96 shares of the capital stock of the Gold Bar Lumber Company, and this claim of the petitioner was afterwards upheld by the courts of the state of Washington, as hereinafter set forth in paragraphs Nos. 13 and 14 hereof.

4. That on December 26, 1910, the Washington-Alaska Bank dispatched by express to petitioner at Seattle gold coin, bullion, and currency of the value of $101,000, to be applied, upon its receipt by petitioner, upon account of its indebtedness to petitioner. That pursuant to a writ of assistance issued by this court on January 7, 1911, said gold coin, bullion, and currency was seized by a United States marshal at Cordova, in the territory of Alaska, and was never delivered to petitioner, but on January 27, 1911, was delivered to the receivers of said Washington-Alaska Bank.

5. That on January 19, 1911, petitioner, by leave of this court, filed in said case its petition, praying for a rescission of said writ of assistance and for an order that said gold coin, bullion, and currency be delivered to it, and set forth therein that said Washington-Alaska Bank was indebted to petitioner on January 4, 1911, in a sum exceeding $140,000; that the matters presented in said petition came on to be heard in this court on March 27, 1911, and more than a week was spent in submitting evidence and arguments of counsel in said matter; that on April 24, 1911, this court made a final order therein, in which it found from the evidence that said Washington-Alaska Bank was on January 3, 1911, indebted to petitioner in the sum of $143,260.15, and that said indebtedness had at the time of the making of said final order, to wit, April 14, 1911, "been reduced to the sum of $129,000, substantially," but denied the prayer of petitioner that said gold coin, bullion and currency be restored to it.

6. That an appeal by petitioner to the Circuit Court of Appeals for the Ninth Circuit was allowed by this court on June 13, 1911, and such further proceedings were had that upon the hearing of said appeal the order of this court was affirmed on February 5, 1912. Dexter Horton Nat. Bank of Seattle, Wash., v. Hawkins, 193 Fed. 363, 113 C. C. A. 287.

7. That on November 28, 1911, this court for the first time made an order requiring the creditors of said Wash-

ington-Alaska Bank to present their claims against said bank to said receiver on or before April 1, 1912, in which order it is receited that the claim of the Dexter Horton National Bank "has been the subject of investigation during this litigation and is not a matter of dispute"; that nevertheless petitioner presented its verified claim to said receiver on March 26, 1912, in the sum of $131,714.73, and on May 18, 1912, said receiver approved and allowed the claim of petitioner in the sum of $129,465.62, disallowing four items of said claim, aggregating the sum of $2,249.11.

8. That on January 9, 1911, this court directed a dividend of 16⅔ per cent. to be paid by the former receivers to the unsecured creditors, whose claims were undoubted and provable by an inspection of the books of said Washington-Alaska Bank, upon the amounts due them on January 4, 1911; that on April 8, 1911, this court directed another and second dividend of 16⅔ per cent. to be paid by former receivers to the unsecured creditors, whose claims were undoubted and provable by an inspection of the books of said Washington-Alaska Bank, upon the amounts due them on January 4, 1911; and on November 7, 1911, this court directed another and third dividend of 16⅔ per cent. to be paid by the present receiver to the unsecured creditors, whose claims were undoubted and provable by an inspection of the books of said Washington-Alaska Bank, upon the amounts due them on January 4, 1911; and no other dividend has been declared or paid.

9. That on June 13, 1912, petitioner applied to said court, by written petition filed in said cause and served upon the present receiver, for an order directing said receiver to distribute and pay to it upon its approved and allowed claim of $129,465.62, the same dividend as had been before that time declared and paid to the unsecured creditors of said Washington-Alaska Bank, to wit, 50 per cent., with interest on $21,577.60 thereof from January 9, 1911, and on $21,-577.60 thereof from April 6, 1911, and on $21,577.60 thereof from November 7, 1911, and frequently thereafter requested said receiver to pay said dividend; but no hearing was ever had upon said petition, or the facts therein set forth, nor were any proceedings had thereon until a new petition was filed by said petitioner, which is the basis of

these proceedings, which said petition was filed on September 16, 1916.

10. That on June 8, 1912, during the absence of the presiding judge of the above-entitled court from the town of Fairbanks, Alaska, and while said court was sitting in Iditarod, Alaska, following certain negotiations between said petitioner, through its attorney at Fairbanks, A. R. Heilig, and said receiver, through his attorney, R. F. Roth, said R. F. Roth forwarded a telegram to said presiding judge in the words following, to wit:

"Hon. Peter D. Overfield, Iditarod, Alaska:

"Dexter bank to Heilig, did receiver accept terms our telegram June 22d. If not we will not delay further. That appears to be threat to dispose stock. Wouldn't it be better pay twenty-five thouand they to hold stock December first.  Might then arrange further time.                                                          R. F. Roth."

To which said telegram said judge of said court, the Honorable Peter D. Overfield, made answer as follows:

"July 9, 1912, R. F. Roth, Fairbanks:

"Receiver authorized if you think best to pay twenty five thousand Dexter Horton Bank provided gold bar retained December first.
                                                          "Overfield."

That upon receipt of said last-mentioned telegram from said judge an agreement was entered into by said petitioner and receiver, acting upon the advice of his attorney, R. F. Roth, which was signed by said receiver on July 13, 1912, and by the petitioner on November 22, 1912, which, among other things, recited and provided as follows:

"Whereas, said receiver was allowed the claim of said [Dexter Horton National] Bank against the Washington-Alaska Bank as it existed on January 4, 1911, in the sum of $129,465.62, and said Dexter Horton Bank is entitled to receive dividends thereon at the same rate as has been paid to other creditors of said Washington-Alaska Bank, at this time amounting to fifty per cent. thereof, with interest upon the several dividends declared from the time of the declaration thereof;

"And whereas, said receiver has $25,000 in hand available for payment upon account said dividends;

"And whereas, said Dexter Horton Bank holds 96 shares of the capital stock of the Gold Bar Lumber Company as collateral security for the payment of its claim against the Washington-Alaska Bank, and said receiver desires that such collateral shall not be sold or converted without his consent prior to June 1, 1913;

"Now, this agreement witnesseth that at the time of the execution

of this instrument by the Dexter Horton National Bank the said receiver has paid to the said last-named bank the sum of $25,000.00 upon account of said dividends, the receipt whereof is hereby acknowledged, and said receiver agrees to pay the balance of said dividends of fifty per cent., with interest, from time to time, as fast as funds available for that purpose come into his hands, and before December 1, 1912, if possible.

"In consideration of the payment of said sum of $25,000 the said Dexter Horton Bank agreed that it will not sell or convert said Gold Bar Lumber stock prior to December 1, 1912, without the consent of said receiver.

"Said Dexter Horton National Bank further agrees that, if said receiver pays the balance of said dividends of fifty per cent., with interest, as fast as funds come into his hands available for that purpose, and completes the payment of said fifty per cent. dividends, with interest, by December 1, 1912, that it will not sell or convert said Gold Bar stock without the consent of said receiver prior to June 1, 1913.

"Said receiver further agrees that, should any further dividends be declared and paid to the other creditors of said Washington-Alaska Bank, said Dexter Horton National Bank shall receive the same rate of dividends upon its claim as other creditors of said bank until the claim of said Dexter Horton National Bank shall have been paid in full."

11. That on August 6, 1912, said receiver paid to the petitioner the sum of $25,000, which said sum was the amount provided and stipulated to be paid at the time of the execution of the agreement last mentioned in paragraph No. 10. But said receiver has not paid petitioner any other or further sum on the amount claimed to be due by said petitioner, by way of dividends or otherwise, save and except that said petitioner received from the sale of said Gold Bar stock as hereinafter mentioned in paragraph numbered 14 the sum of $100,000 less the costs, amounting to $45.05.

12. That the superior court for the state of Washington in and for the county of King, sitting at Seattle, at all times herein stated, was and is a court of general jurisdiction over matters of equity and law, duly organized and existing under and by virtue of the laws of the state of Washington.

13. That on April 9, 1913, petitioner commenced suit in equity in said superior court against said Washington-Alaska Bank, and said receiver, for the purpose of foreclosing its lien on said pledge, and procuring the sale thereof, and applying the proceeds of such sale to the payment of the debts owing by said Washington-Alaska Bank to petitioner on

January 4, 1911, in the amount approved and allowed by said receiver as aforesaid; that petitioner filed its complaint in said action, and caused notice thereof to be given to said receiver, and thereupon the judge of this court directed said receiver to go to Seattle, Wash., to appear in such cause, to employ competent counsel to assist him, and to resist such foreclosure; that said receiver did go to Seattle, did employ competent counsel, and filed his answer in said cause, to which a reply was filed by petitioner, and said cause came on then to be heard by said superior court of King county, and such proceedings were had in said court and cause that, on the 18th day of November, 1913, said court made, rendered, and entered judgment therein as follows:

"In the Superior Court for the State of Washington in and for the County of King.

"The Dexter Horton National Bank, of Seattle, a Corporation, Plaintiff, v. Washington-Alaska Bank, a Corporation, F. G. Noyes, as Receiver of the Washington-Alaska Bank, a Corporation, A. T. Armstrong, and E. T. Barnette, defendants.

"No. 93651.

"Judgment.

"This cause having come on regularly for trial on the 18th day of November, 1913, before the above-entitled court, plaintiff, appearing by John H. Powell, one of its attorneys, and the defendant Washington-Alaska Bank, a corporation organized under the laws of the state of Nevada, with its principal place of business at Fairbanks, in the territory of Alaska, and F. G. Noyes, as receiver of said Washington-Alaska Bank, appearing by W. T. Dovell, their attorney, and the court having heard the evidence offered on behalf of the respective parties and the arguments of the respective counsel, and having taken said case under advisement, and being fully advised in the premises, and it further appearing to the court that the defendants A. T. Armstrong and E. T. Barnette were each and both at the time of the commencement of this action, and at all times since have been, residents of the state of California, and that neither of them has at any of said times been a resident of the state of Washington, and that they have been each duly regularly served with summons in this action by publication, and that neither of them has in any manner appeared in this action:

"Now, therefore, upon motion of the plaintiff, it is considered, ordered, adjudged, and decreed by the court that the said defendant A. T. Armstrong and the defendant E. T. Barnette are both and each of them in default, and the default of each of them is hereby entered.

"And it is further ordered, considered, adjudged, and decreed by the court as follows:

"1. That between the 9th day of December, 1910, and the 5th day of January, 1911, the plaintiff and the defendant Washington-Alaska Bank had mutual dealings whereby the plaintiff paid and advanced to the defendant Washington-Alaska Bank, and to divers and sundry other persons and corporations for its account and at its request, large amounts of money, and that there was due to the said plaintiff on the 5th day of January, 1911, from the said defendant Washington-Alaska Bank, for and on account of the aforesaid dealings and advancements, the sum of one hundred and twenty-nine thousand four hundred sixty-five and $62/100$ dollars ($129,465.62), and that there has since said date, to wit, on the 6th day of August, 1912, been paid thereof by the said F. G. Noyes as receiver of said Washington-Alaska Bank, the said sum of twenty-five thousand dollars ($25,000), and that no other payments have been made, and that there is now due to the plaintiff the Dexter Horton National Bank of Seattle, a corporation, from the said defendant Washington-Alaska Bank, the sum of one hundred twenty-six thousand nine hundred seven and $80/100$ ($126,907.80) dollars.

"2. That in order to secure the plaintiff for the money so paid out and advanced by it to and for the said defendant Washington-Alaska Bank the said Washington-Alaska Bank did on or about the 6th day of December, 1910, pledge and deposit to the aforesaid plaintiff, ninety-six (96) shares of the capital stock of the Gold Bar Lumber Company, a corporation, then and now duly organized and existing under and by virtue of the laws of the state of Washington, all of which said 96 shares were then the property of said Washington-Alaska Bank, and have at all times since, and until the trial of this cause, been in possession of the plaintiff under such pledge. That 94 of said shares were represented and evidenced by one certain certificate of stock No. 15, duly issued by the said Gold Bar Lumber Company, bearing date the 8th day of September, 1908, to Fairbanks Banking Company, which Fairbanks Banking Company was the then name of the defendant Washington-Alaska Bank. That one of said shares was represented and evidenced by one certain certificate of stock No. 14, duly issued by the said Gold Bar Lumber Company, bearing date the 14th day of August, 1906, to one A. T. Armstrong. That one of said shares was represented and evidenced by one certain certificate of stock No. 16, bearing date September 8, 1908, duly issued by said Gold Bar Lumber Company to E. T. Barnette. That the aforesaid certificates each and all were upon the trial of this case filed herein by the plaintiff and are now in possession of the clerk of this court.

"3. That the plaintiff, the Dexter Horton National Bank of Seattle, a corporation, do have and recover of and from the defendant Washington-Alaska Bank, a corporation organized under the laws of the state of Nevada, with its principal place of business at Fairbanks, in the territory of Alaska, the sum of one hundred twen-

ty-six thousand nine hundred and seven and $^{80}/_{100}$ ($126,907.80) dollars and the costs of this action. That plaintiff's lien by virtue of said pledge upon each and every of said shares of stock above described be and the same is hereby established as a first, prior, and superior lien to any right, title, claim, or interest of each and every of the defendants therein, and that said lien and pledge be and the same is hereby foreclosed, and that each and all of said shares, or so much thereof as shall be necessary, be sold by the sheriff of King county, Washington, according to law and the practice of this court, to satisfy the amount due plaintiff as aforesaid, and that the plaintiff may be a purchaser of all or any part of said pledged property at such sale. That upon the issuance and delivery by the clerk of this court to said sheriff of an order of sale herein directing the said sheriff to make such sale as aforesaid, the clerk of this court shall deliver said certificates, and all thereof, to the said sheriff for the purpose of said sale, and the said sheriff shall, upon a sale of said shares, deliver to the purchaser thereof the aforesaid certificates therefor.

"Done in open court this 16th day of January, 1914.

"R. B. Albertson, Judge."

14. That thereafter said receiver by order of this court appealed from said judgment to the Supreme Court of the state of Washington, by which court foregoing judgment was duly affirmed on August 4, 1915. That thereafter, on January 30, 1914, pursuant to foregoing judgment and an order of sale issued by the clerk of the superior court and delivered to said sheriff, the sheriff of said county of King sold said 96 shares of the capital stock of the Gold Bar Lumber Company at public sale, after due advertisement thereof according to the laws of the state of Washington and practice of said court, for the sum of $100,000. That the proceeds of said sale were applied first to the payment of the costs and disbursements of petitioner in said action and costs of sale amounting to $45.05, then to the interest which had accrued upon said judgment from January 16, 1914, to the day of the sale, amounting to $296.11, and the balance upon account, and in part payment, of said judgment, leaving a balance due petitioner on January 30, 1914, amounting to $27,248.76. That upon motion of attorneys for petitioner, duly served on the attorneys for said receiver on February 3, 1914, and no objection thereto being made, said court on February 7, 1914, confirmed said sale.

15. That all of the dividends mentioned in paragraph numbered 8 hereof, directed by said court to be paid by the for-

mer receivers and present receiver of said defendant, were paid by them during their term of office as such receivers with the knowledge and without any objection on the part of said petitioner at the time or times of the making of said orders by said court; said petitioner at the time of the making thereof expecting favorable result as to it of the litigation commenced and then pending by it against said receivers for the rescission of the writ of assistance and the payment to it of the gold coin, bullion, and currency of the value of $101,000, hereinbefore referred to in paragraphs numbered 4, 5, and 6 hereof, and relying further upon the security of said 96 shares of Gold Bar stock.

Fernand De Journel, of San Francisco, Cal., for receiver.

A. R. Heilig, of Portland, Or., and W. A. Peters and John H. Powell, both of Seattle, Wash., for petitioner.

BUNNELL, District Judge. The position taken by the petitioner is that the decisions of the Supreme Court of the United States in Merrill v. National Bank of Jacksonville, 173 U. S. 131, 19 Sup. Ct. 360, 43 L. Ed. 640, and Aldrich v. Chemical National Bank, 176 U. S. 618, 20 Sup. Ct. 498, 44 L. Ed. 611, are controlling in this case, and that the sum of $27,248.76 claimed to be due on January 30, 1914, was ascertained in accordance with the methods of calculation employed in those cases. In Merrill v. National Bank of Jacksonville, supra, the rule is established that:

"A secured creditor of a national bank may prove and receive dividends upon the face of his claim as it stood at the time of the declaration of insolvency, without crediting either his collaterals, or collections made therefrom after such declaration, subject always to the proviso that dividends must cease when, from them and from collaterals realized, the claim has been paid in full."

By this rule a secured creditor of an insolvent national bank is assured that if the dividends declared, together with the proceeds of any security held, are equal to the amount of his claim, that is, principal and interest, he will be paid in full; and it may be permissible to add that the unsecured creditor is by the same rule assured that the secured creditor will not be permitted to take more than is due him. In the administration of estates under receivership, the District Court, while recognizing the ruling of the Supreme Court

as the law, have endeavored to determine each case with due regard to the equities thereof, and not to apply the rule of the Supreme Court as a solution for every problem similar, but not identical. In Hitner v. Diamond State Steel Co. (C. C.) 176 Fed. 390, the court gives the following as the first question raised for decision:

"Whether one having a pecuniary claim ascertained in amount against an insolvent corporation in the hands of receivers, and holding collateral security for its payment, has a right in equity to receive out of its general assets pro rata dividends calculated on the basis of the amount of the corporate indebtedness to him existing at the time of the declaration of insolvency, including interest thereon, if any, to that time, without regard to such collateral security or any payment or payments he may have received on account of his claim since that time, provided, that he shall not receive and retain from any or all sources more than the real amount of his claim, with interest thereon until paid, aside from any costs, charges and expenses incurred by him in the enforcement of or realization upon such collateral security."

And, commenting thereon, it was said:

"Whatever might be the inclination of this court on the subject were it res integra, the first of these two questions [the question above] has been set at rest by the Supreme Court in Merrill v. National Bank of Jacksonville, 173 U. S. 131, 19 Sup. Ct. 360, 43 L. Ed. 640; the court there fully recognizing and approving the following as the chancery rule: 'The creditor can prove for, and receive dividends upon, the full amount of his claim, regardless of any sums received from his collateral after the transfer of the assets from the debtor in insolvency, provided that he shall not receive more than the full amount due him.' "

As distinguished from the chancery rule, the Supreme Court, in Sexton v. Dreyfus, 219 U. S. 339, 31 Sup. Ct. 256, 55 L. Ed. 244, lays down the bankruptcy rule as follows:

"Under the Bankruptcy Act of 1898, a secured creditor selling his securities after the filing of the petition must apply the proceeds, other than interest and dividends accrued since the date of the petition, first to the liquidation of the debt with interest to the date of the petition; he cannot first apply such proceeds to interest accrued since the petition.

"A secured creditor of a bankrupt can apply interest and dividends accruing on the securities after the date of the petition to interest on the debt accruing after such date."

The two rules are thus established.

In Westinghouse Elec. & Mfg. Co. v. Idaho Ry., L. & P. Co. (D. C.) 228 Fed. 972, the court holds that:.

Since "Rev. Codes Idaho, § 4520, provides that there can be but one action for the recovery of any debt or the enforcement of any right secured by mortgage; which action in case of mortgage is defined as a foreclosure suit, in which, after sale of the property, but not before, the plaintiff may have judgment, which he may satisfy by execution, but only for the amount of the debt remaining unpaid, * * * in view of such statutory provisions, on distribution by a federal court of equity in Idaho of the assets of an insolvent corporation, the trustee of a mortgage of property in the state is entitled to share as a creditor in the unmortgaged assets in the hands of a receiver on the basis of the amount of his deficiency judgment only."

The same court also cites Commercial & Savings Bank v. Robert H. Jenks Lumber Co. (C. C.) 194 Fed. 732, to the effect that neither the National Bankruptcy Act (U. S. Comp. St. §§ 9585–9656) nor the state insolvency law is binding upon a federal court administering an estate through a receivership in the general course of equity. It is worthy of note, however, that in 194 Fed. 732, supra, the court decides that:

"Where an insolvent corporation deposited collaterals with claimant bank as security for its entire indebtedness, the bank on administration of the corporation's estate in equity was entitled to prove its claim for the full amount of its debt and to receive dividends up to the balance due after crediting the proceeds of the sale of the collaterals."

And in the Westinghouse Case, supra, in commenting upon the rule laid down by the Supreme Court in national bank cases, the court says:

"And upon principle possibly no substantial reason can be given why, if controlling in national bank cases, the rule should not be extended to other insolvent estates, and to mortgage claims as well, provided, of course, there are no opposing statutory provisions."

Any confusion now existing with respect to the Supreme Court cases above cited is not on account of what is therein stated, but on account of a tendency to extend the scope of the rule announced. The rule was made applicable to "a secured creditor of an insolvent national bank." In Merrill v. National Bank of Jacksonville two kinds of indebtedness are mentioned: First, the indebtedness upon the unsecured drafts for $6,010.47, which claim was proved and upon which

there was no controversy; second, the secured claim of $10.-093.34—and it was with reference to a secured claim that the Supreme Court made its ruling. It is nowhere stated that, because the sum of $10,093.34 was secured, there was thereby imparted to the whole indebtedness the status of being secured. In Aldrich v. Chemical National Bank the claim under consideration was a secured claim in the sum of $305,450, secured first by a certificate of deposit for the sum of $300,000, together with other collateral security in the shape of notes presumably bearing the indorsement of the bank giving them for security. If the debtor bank transfers to the creditor bank collateral security consisting of certificates of deposit, notes, and bonds regularly indorsed, the face value of which is expressed thereon in words and figures in an amount equal to or more than the indebtedness and interest to accrue, it must be said that the creditor bank is a secured creditor. The creditor bank presumably investigates the security tendered and accepts the same only after having satisfied itself that it is sufficient and that the debtor bank has in good faith placed upon it by its certificate or endorsement the stamp of a bona fide transaction. Were it otherwise, the relation would not and should not exist. Webster defines "secure" to mean to put beyond hazard of losing, or of not receiving. And so I take it the Supreme Court was looking to the good faith of the original transaction, and giving to it the force and effect to which it was entitled. In the Chemical National Bank Case the equities were in favor of the rule. Necessarily there is a vast difference between a secured creditor and a creditor with some security. Certainly it was never intended that a little security should make the account stand forth forever as secured in toto. To say that $10,000 of collateral security fixes the status of the creditor to whom there is due $50,000 as that of a secured creditor is as contrary to equity and right as it is to say that by a payment on account the debtor is entitled to have the bill rendered marked "Paid." If a banking institution is satisfied with having in its possession by way of security, speculative stocks, or any other kind of prima facie undetermined security, it should not be allowed in the administration of an insolvent estate to rise to the dignity of being classed as a secured creditor in an amount greater than

the value of its security. The purpose is to accomplish an equitable ratable distribution among all the creditors.

Were it not for the contract entered into by the petitioner and the receiver July 13, 1912, I should determine the rights of the petitioner in accordance with the views above expressed. Such a determination would safeguard the interests of the unsecured creditors, reward the petitioner for its diligence, and would not do violence to any equitable ruling announced by the Supreme Court. The following determination would then be made: The Washington-Alaska Bank owed the Dexter Horton National Bank on the 4th day of January, 1911, the sum of $129,465.62. The 96 shares of Gold Bar Lumber Company stock of uncertain value, held as a pledge, were sold by order of court in the state of Washington, and the proceeds of such sale on the 30th day of January, 1914, amounted to $99,954.95. The delay in realizing on this pledge was not the fault of the petitioner, and therefore it is necessary to ascertain what sum of money at 6 per cent. interest per annum on January 4, 1911, would amount to $99,954.95 on January 30, 1914. This sum is $84,-421.41. The petitioner would therefore be entitled to participate in dividends, the same as other creditors, calculated on the sum of $45,044.21. Dividends of 16⅔ per cent. each were declared January 9, April 8, and November 7, 1911, respectively, and were not paid to petitioner. Calculating interest thereon from the date declared to August 6, 1912, on which date the petitioner was paid the sum of $25,000, it is found that by the payment of $25,000 the petitioner was overpaid to the extent of $833.75. Future dividends would be calculated on the sum of $45,044.21, but from the first dividend or dividends declared the sum of $833.75 would be deducted.

I have thus commented upon the Supreme Court rule, and illustrated its application to the claim of the Dexter Horton Bank, based upon the security of the Gold Bar stock as originally held, for the reason that the agreement between the petitioner and the receiver on July 13, 1912, will determine the matter under consideration in favor of the petitioner, and I do not wish to be understood as holding that a creditor who takes stocks of uncertain and undetermined value as security shall in the administration of an insolvent es-

tate be permitted, for that reason alone, to be classed as a secured creditor.

The agreed statement of facts shows that the value of the Gold Bar stock must have been considered by both the petitioner and the receiver to have been far in excess of the claim of the petitioner against the Washington-Alaska Bank. On July 8, 1912, the attorney for the receiver sent the following wire to the judge of this court:

"Honorable Peter D. Overfield, Iditarod, Alaska. Dexter Horton to Heilig—Did receiver accept terms our telegram June 22d. If not we will not delay further. That appears to be threat to dispose stock. Wouldn't it be better pay twenty-five thousand they to hold stock December first. Might then arrange further time."

Judge Overfield replied:

"Receiver authorized if you think best to pay twenty-five thousand Dexter Horton Bank provided Gold Bar stock retained December first."

The agreement set forth in paragraph 10 of the agreed statement of facts was thereupon entered into by the Dexter Horton Bank and the receiver. In the first place, it must be admitted that the judge of the court could not delegate any judicial function to be by him performed to the attorney for the receiver. It was not a question of what the attorney might think, but what the court upon consideration should order. In the second place, although the contract entered into was beyond the scope of any authority granted to the receiver, yet thereafter the receiver's report showing the payment of $25,000 was filed and duly approved by the court. The contract was at least ratified by implication. Later, when the Dexter Horton Bank sought to foreclose its lien on the Gold Bar stock, the receiver was ordered to go to Seattle and resist such action. Necessarily the validity of the contract was a matter for determination in that proceeding. Judgment was given in favor of this petitioner, which judgment was, on appeal to the Supreme Court for the state of Washington, duly affirmed. See 86 Wash. 452, 150 Pac. 1176. It will be noticed that the contract entered into by the petitioner and the receiver brings the claim for $129,465.62 and the Gold Bar stock as collateral squarely within the Supreme Court rule. The records of this court show that the receiver was justified in believing that the

Gold Bar stock was worth at least twice the amount of the petitioner's claim, and I have no doubt that the court, the receiver, and his attorney believed it was for the best interest of the estate to delay any threatened action to dispose of the Gold Bar stock.

Interest will be calculated at 6 per cent. per annum.

The claim on January 5, 1911, was for the sum of $129,-465.62, on which there was a payment of $25,000 August 6, 1912. The proceeds of the sale of the Gold Bar stock January 30, 1914, amounted to $99,954.95. There was therefore due the Dexter Horton Bank on that date the sum of $27,225.47. The petitioner asks for interest on this sum at 8 per cent. per annum from January 30, 1914. In my opinion the Washington courts have determined that the original contract was a contract under the laws of the state of Washington. Interest will be allowed at 6 per cent. per annum.

In accordance with the views herein expressed, an order may be prepared and submitted.

⊜⟶See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes